Argued and submitted September 25, reversed December 26, 2002

# OREGON UNIVERSITY SYSTEM (OUS),
## *Respondent,*

*v.*

# OREGON PUBLIC EMPLOYEES UNION,
## Local 503,
### *Petitioner.*

## UP-61-98; A116248

60 P3d 567

Elizabeth Baker argued the cause and filed the briefs for petitioner.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Petitioner Oregon Public Employees Union (OPEU), the exclusive representative of a bargaining unit of classified staff employed by the Oregon University System (OUS), seeks judicial review of an order on reconsideration of the Employment Relations Board (ERB), in which ERB concluded that OPEU had committed an unfair labor practice under ORS 243.672(2)(d). Specifically, OPEU assigns error to ERB's conclusion that OPEU breached its duty of good faith and fair dealing under the parties' collective bargaining agreement (CBA) when its staff sent e-mail to OUS employees at work. OUS cross-assigns error to ERB's conclusions that OPEU did not violate the express terms of the CBA and that OPEU did not refuse to abide by an arbitration award. We review ERB's factual findings for substantial evidence and its legal conclusions for errors of law. ORS 183.482(8)(a) - (c). We reverse.

Because they are supported by substantial evidence, we take the following facts from ERB's order on reconsideration. OPEU entered into a CBA for the years 1993 to 1995 with OUS's predecessor agency. The CBA allowed the union to use bulletin boards to communicate with its members in designated areas of the employer's work premises. During negotiations for a successor agreement, OPEU proposed to use an electronic bulletin board to post messages that its members could access. The 1995-97 agreement between OPEU and OUS's predecessor agency ultimately provided, in Article 10, Section 4, that union officers and stewards "shall" have access to electronic bulletin boards under specified conditions. That provision was carried over, in almost identical form, to the 1996-99 CBA between OPEU and OUS, which furnishes the basis for this proceeding.[1] The 1995-97 and the

---

[1] Article 10 of the parties' 1996-99 CBA pertains to union rights. Section 4 provides:

"The university shall allow the use of reasonable bulletin board space for communicating with employees. Union material shall not be displayed in the work area except in the designated bulletin board space. Union officers and stewards shall have the authorization to post messages to an electronic bulletin board or post office box system for internal union business where a university currently uses such a system, provided all of the following conditions are met:

1996-99 CBAs contained grievance procedures for OPEU, culminating in final and binding arbitration, but neither provided a grievance procedure for OUS.

The parties disputed the meaning of Article 10, Section 4, under the 1995-97 CBA, and OPEU filed a grievance regarding that dispute, which was submitted to binding arbitration. On September 11, 1997, the arbitrator concluded that OUS's predecessor did not violate the CBA when it barred union officers and stewards from using e-mail to post what OPEU had described as "noninteractive" messages. While the arbitration was pending, OUS and OPEU entered into the 1996-99 CBA, which left Article 10, Section 4, unmodified and intact. In early 1998, OPEU filed another grievance relating to the meaning of Article 10, Section 4, in the 1996-99 CBA, which was again submitted to binding arbitration. A different arbitrator also concluded that OUS did not violate the CBA by denying OPEU use of its e-mail system to communicate with OUS employees regarding union business. Nonetheless, in 1998, 1999, and 2000, OPEU used the OUS e-mail system to communicate with its members. During that period, OUS sent various letters to the union maintaining that OPEU's continuing e-mail activity violated the CBA and the arbitrators' rulings.

On December 22, 1998, OUS filed a complaint with ERB, alleging that OPEU had violated ORS 243.672(2)(d) by not abiding by the first arbitrator's decision. On July 2, 1999, in response to the second arbitrator's decision, OUS filed an amended complaint, adding an allegation that OPEU had

---

"(a) The electronic bulletin board system shall not be used for interactive communications;

"(b) Usage shall comply with university policies applicable to all users such as protection of confidential information and security of equipment;

"(c) There shall be no additional cost to the university for use of the electronic bulletin board program; and

"(d) Authorized Union-represented employees who post messages to the system shall do so on their own time.

"This provision no longer applies when a university changes or discontinues a computer system and thereby loses the ability to maintain an electronic bulletin board or similar system."

violated ORS 243.672(2)(d) by not abiding by the second decision. On August 2, 1999, OUS filed a second amended complaint alleging that OPEU had breached the CBA by its continued use of the OUS e-mail system. OUS filed a third and final amended complaint on September 9, 1999.[2] A hearing officer concluded that OPEU had not refused to abide by the arbitration decisions but that it had violated Article 10, Section 4, of the CBA.

ERB agreed with the hearing officer that OPEU had not refused to abide by the second arbitrator's decision[3] and, over the dissent of one board member, ERB concluded that OPEU's activities neither violated the express terms of the CBA nor constituted a breach of the implied duty of good faith and fair dealing.[4] OUS filed a petition for reconsideration. On reconsideration, ERB reversed its prior order in part and concluded that OPEU had committed an unfair labor practice by breaching its duty of good faith and fair dealing. OPEU then sought judicial review of ERB's order on reconsideration.

ORS 243.672(2) provides, in part:

"Subject to the limitations set forth in this subsection, it is an unfair labor practice for a public employee or for a labor organization or its designated representative to do any of the following:

"* * * * *

"(d)   Violate the provisions of any written contract with respect to employment relations, including an agreement to arbitrate or to accept the terms of an arbitration award,

---

[2] In its order, ERB used the filing date of the third amended complaint to limit the time period of violations it would consider. In a footnote, ERB stated that, in addition to violations occurring after the filing date of the third amended complaint, it would consider "those alleged violations occurring within 180 days prior to the September 9, 1999 amended complaint, exclusive of alleged violations occurring between July 1, 1999 and October 25, 1999," a time period during which no CBA was in effect.

[3] ERB dismissed as untimely OUS's claim that OPEU failed to abide by the first arbitrator's award in violation of ORS 243.672(2)(d). OUS does not challenge that ruling on review.

[4] The hearing officer had not addressed the implied duty of good faith and fair dealing, presumably because she concluded that OPEU had breached the express terms of the CBA.

where previously the parties have agreed to accept such awards as final and binding upon them."[5]

Although we normally would begin our analysis with the petitioner's assignment of error on review, the nature of the issues here dictates otherwise. ERB concluded that OPEU breached its implied duty of good faith and fair dealing, but it necessarily reached that determination only after concluding that OPEU had not breached any express provision of the CBA. That is so because a duty of good faith and fair dealing—which serves to effectuate the objectively reasonable expectations of the parties—may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue; indeed, the reasonable expectations of the parties are irrelevant if the parties have agreed to express terms governing the issue. *See Tolbert v. First National Bank*, 312 Or 485, 492, 823 P2d 965 (1991).

Logically then, where both types of claims are at issue on review, a breach of express contract claim should be analyzed before a claim of breach of the implied duty of good faith and fair dealing. Thus, we begin with OUS's first cross-assignment of error, that ERB erred in concluding that OPEU had not committed an unfair labor practice by breaching an express provision of the CBA. OUS concedes that the CBA is silent on e-mail use, but it argues that OPEU's use of its e-mail system is inconsistent with Article 10, Section 4, of the CBA. OUS also contends that the "Management's Rights" provision, Article 9 of the CBA, reserves to it all rights that are not specifically modified elsewhere in the CBA. According to OUS, those retained rights include control over its e-mail system. OPEU responds that Article 10, Section 4, is inapplicable here. It also asserts that Article 9 does not give OUS the right to direct the internal operations of OPEU staff and that, because the CBA is silent on the use of e-mail, OPEU did not bargain not to send e-mail from its own computers. OPEU further asserts that OUS does not lose control over its property when OPEU sends e-mail and that, in any event, OUS employees, not OPEU, are "using" OUS's property to receive such e-mail.

[5] For convenience, we refer to the 2001 version of the statute, which is identical to the version in effect when OUS filed its complaint before ERB.

■ We review ERB's interpretation of the CBA for errors of law. ORS 183.482(8)(a). As ERB correctly recognized, CBAs generally are interpreted in the same manner as are other contracts. *Portland Fire Fighters' Assn. v. City of Portland*, 181 Or App 85, 91, 45 P3d 162, *rev den*, 334 Or 491 (2002) (citing *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991)). At the first level of analysis, we examine the text of the disputed contract provision in the context of the entire CBA. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). If the text is unambiguous, no further analysis is warranted. *Marion Cty. Law Enforcement Assn. v. Marion Cty.*, 130 Or App 569, 576, 883 P2d 222 (1994), *rev den*, 320 Or 567 (1995) (finding error where ERB resorted to extrinsic evidence when contract provisions were not ambiguous). A contract provision is ambiguous if it can reasonably be given more than one plausible interpretation. *Portland Fire Fighters' Assn.*, 181 Or App at 91.

■ We agree with ERB and the parties that the CBA here is unambiguous. The term "e-mail" does not appear anywhere in the CBA. Article 10, Section 4, does refer to an "electronic bulletin board or post office box system," to which "union officers and stewards" may "post" messages, and it mandates that any electronic bulletin board system be "non-interactive." However, that provision cannot be read to apply to e-mail. E-mail is "electronic mail" or "a message sent by electronic mail." *Webster's Collegiate Dictionary* 376 (10th ed 1999).[6] By contrast, an electronic "bulletin board" is "a program on a computer system that allows users to read and write public notices and is accessed usu[ally] by modem." *Webster's* at 151.

Moreover, Article 10, which sets out 18 sections pertaining to union rights, does not purport to govern all of OPEU's rights and obligations relating to communication with its members. It fails to address, for example, whether OPEU representatives are permitted to communicate with OUS employees at the latter's work telephone numbers

---

[6] We resort to the cited dictionary because the terms "e-mail" and "electronic bulletin board" are of recent vintage and do not appear in the 1993 edition of *Webster's Third New Int'l Dictionary*, our usual source for the ordinary meaning of words.

regarding union business. Read in context, Article 10, Section 4, simply does not prohibit OPEU staff from sending e-mail to union members at their work e-mail addresses.

As noted, OUS also asserts that Article 9—the Management's Rights provision of the CBA—prohibits OPEU's use of OUS's e-mail system to communicate with employees at work. That provision states:

"Except as may be specifically modified by the terms of this Agreement, the Employer shall retain all rights of management in the direction of their work force. Rights of management shall include, but not be limited to, the right to:

"(a) Direct employees.

"(b) Hire, promote, transfer, assign and retain employees.

"(c) Suspend, discharge or take other proper disciplinary action against employees.

"(d) Reassign employees.

"(e) Relieve employees from duty because of lack of work or other reasons.

"(f) Schedule work.

"(g) Determine methods, means and personnel by which operations are to be conducted."

Although ERB did not address Article 9 in either its original order or its order on reconsideration, ERB apparently rejected OUS's argument that Article 9 provided the contractual basis for finding an express breach.

We likewise are not persuaded by OUS's argument. OPEU's conduct does not violate any of the specified management rights listed in Article 9. Article 9 focuses on the rights of management to direct its "work force," and each of the subsections, explicitly or implicitly, recognizes management's authority over its "employees." None of the management rights listed in Article 9 addresses union activity, however. Even assuming for the sake of argument that, when Article 9 reserves "all rights of management in the direction of [its] work force," it reserves OUS's right to control its employees'

use of OUS computers to receive and read OPEU e-mails, it does not reserve a right to prevent OPEU from sending the e-mails. Article 9 governs the rights of management to direct *its employees*, not those of OPEU. Nor does OUS assert that OPEU's e-mail practices somehow interfere with its authority under Article 9 to direct its employees or to determine the method, means, or personnel by which operations are conducted. We conclude that the CBA is unambiguous and that it does not address the specific conduct at issue. Accordingly, we affirm ERB's ruling that OPEU did not breach any express provision of the CBA as alleged in OUS's complaint.

We turn to OPEU's assignment of error on review, in which it asserts that ERB erred in concluding that it committed an unfair labor practice by breaching its duty of good faith and fair dealing and in ordering OPEU to cease and desist from sending e-mail to OUS employees. OPEU argues that, because the CBA is silent with respect to e-mail use, there is no contractual obligation to which the duty of good faith and fair dealing could attach. According to OPEU, because the CBA is unambiguous, ERB erred in resorting to extrinsic evidence to discern such a duty.

Again, OUS concedes that the CBA does not specifically address e-mail. However, relying on Article 9 and the general principle that a union may not use an employer's property unless it has bargained for that right, it argues that, in the absence of a specific provision giving OPEU paid staff the right to use OUS's e-mail system, OPEU had no reasonable expectation that it had such a right.

In *Perkins v. Standard Oil Co.*, 235 Or 7, 16, 383 P2d 107 (1963), the Oregon Supreme Court first recognized that every contract includes an implied covenant of good faith and fair dealing. In that case, the court held that an oil company had an implied duty not to solicit its distributor's customers, even though the contract between them provided that the oil company retained the right to select its own customers. In doing so, the court observed that, if the oil company "was at liberty to solicit as direct customers, as it contends, [plaintiff's customers], plaintiff was in a state of economic servility; we do not believe that the parties intended such a result at the time the contract was signed." *Id.* at 17. Although the

court invoked a duty that was not expressed in the contract, it did so in order to fulfill the parties' reasonable expectations, which, in its view, could not have been to create a completely one-sided agreement. *Id.* at 16.

The doctrine was further developed in *Best v. U. S. National Bank*, 303 Or 557, 739 P2d 554 (1987), where the court considered the extent to which a duty of good faith and fair dealing may circumscribe contractually granted discretion. There, depositors challenged the rate at which a bank set nonsufficient funds (NSF) fees pursuant to a contract term subjecting all accounts to "[b]ank service charges existing at any time." *Id.* at 560. After noting that nothing in the account agreement expressly limited the bank's authority to set NSF fees, the court held that the obligation of good faith "limited the [b]ank's apparently unlimited authority to set NSF fees, and the depositors [could] recover for the breach of this obligation just as they could for the breach of any other contractual obligation." *Id.* at 561. The court adopted the approach of the *Restatement (Second) of Contracts,* quoting the comments to section 205 on good faith:

> " 'Good faith performance or enforcement of a contract emphasizes faithfulness to an *agreed common purpose* and consistency with the *justified expectations* of the other party * * *.
>
> " '* * * * *
>
> " '* * * A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance.' "

*Best,* 303 Or at 562-63 (quoting *Restatement (Second) of Contracts* § 205 comments a, d (1979)) (emphasis added).

Thus, even though every contract contains an implied duty of good faith and fair dealing, that duty does not operate in a vacuum. As the citations to the *Restatement (Second) of Contracts* in *Best* suggest, the duty focuses on the "agreed common purpose" and the "justified expectations" of

the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract.[7] In this case, then, the dispositive question is whether it was appropriate to imply a duty on the part of OPEU to refrain from sending e-mail in order to effectuate the parties' objectively reasonable expectations regarding the operation of Article 10, Section 4, or Article 9 of the CBA.

We conclude that it was not. As noted, Article 10 does not purport to regulate comprehensively all forms of communication between OPEU and its members who are employed by OUS. Article 10, Section 4, governs only postings to a noninteractive electronic bulletin board system, if such a system exists at a particular OUS institution. Its provisions relating to establishment and maintenance of an electronic bulletin board—which must be used in accordance with the restrictions listed in that section—can be effectuated regardless of any conduct of OPEU staff relating to the use of e-mail.

Moreover, as noted, Article 9 focuses on the employer's rights to manage its work force, not on union conduct; if OPEU does not interfere with those management rights, it does not violate the letter or spirit of Article 9. Again, OUS does not assert that OPEU's use of the former's e-mail system inhibits the performance or enforcement of any of the subsections of Article 9 or any other "rights of management" not enumerated there but implicitly intended to be

---

[7] *Eggiman v. Mid-Century Ins. Co.*, 134 Or App 381, 895 P2d 333 (1995), is not to the contrary. There, we rejected the defendant insurer's argument that a duty to preauthorize medical treatment in good faith arose only when the contract contained an express contractual duty to preauthorize. We stated that, in *McKenzie v. Pacific Health & Life Ins. Co.*, 118 Or App 377, 847 P2d 879 (1993), *rev dismissed as improvidently allowed*, 318 Or 476 (1994), there was no express duty to preauthorize treatment, but we implied it from the insurer's general "obligation to pay all covered claims." *Eggiman*, 134 Or App at 386 (citing *McKenzie*, 118 Or App at 381). We also stated in *Eggiman* that *Uptown Heights Associates v. Seafirst Corp.*, 127 Or App 355, 873 P2d 438 (1994), *aff'd in part, rev'd in part*, 320 Or 638, 891 P2d 639 (1995), did not "hold that an implied duty of good faith must precisely refer to a specific express contractual duty." *Eggiman*, 134 Or App at 386. We concluded that the duty to preauthorize treatment was "properly implied" because, without such a duty, an insurer could avoid its contractual obligations altogether. *Id.* at 387. We invoked the duty of good faith in *Eggiman* as a corollary to the insurer's obligation to pay all covered claims. We did *not* hold that such a duty could be imposed if it had nothing to do with the specific, express provisions of a contract.

included. Thus, implying a duty to refrain from sending e-mail also is not necessary to effectuate the parties' reasonable expectations regarding Article 9.

■     Assuming without deciding that resorting to extrinsic evidence is proper in these circumstances, the evidence shows that, after extensive bargaining, the parties decided not to include an express term in the CBA regarding the union's use of OUS's e-mail system. ERB apparently accepted OUS's version of the parties' bargaining history in concluding that OPEU breached the implied duty of good faith and fair dealing. However, even if, as represented in that history, OUS refused to agree to a provision *authorizing* the use of e-mail, that history does not necessarily mean that both parties expected that such use would be *prohibited*. It is equally plausible to infer that the parties simply could not agree on the issue. On that point, our observation in *Vanderselt v. Pope*, 155 Or App 334, 339, 963 P2d 130, *rev den*, 328 Or 194 (1998), is apt:

> "We are aware of no cases where a party has been held to have formed an implied contract in spite of the party's clear, explicit, contemporaneous declaration that it did *not* wish to form a contract on that subject. Formation of a contract requires the meeting of minds, which is measured by objective manifestations of intent by both parties to form the contract."

(Emphasis in original.)

OUS had the burden, as the complainant in the underlying unfair labor practice complaint, to establish that OPEU breached its implied duty. OAR 115-035-0042(6). That burden required OUS to identify the parties' objectively reasonable expectations. It attempted to do so by referring to general labor law principles with respect to which, it contended, the parties presumably bargained. It relied on a principle that ERB explained as follows:

> "[T]he general rule in the private sector is that a union and its members do not have a statutory right to use the employer's equipment to communicate. In both the private sector and under the Public Employee Collective Bargaining Act, the subject of access to the employer's equipment

for union communications is typically mandatory for bargaining. * * * Thus, if a right to use equipment exists, it must be found in the collective bargaining agreement."

(Footnote omitted.) ERB discerned that principle from a National Labor Relations Board (NLRB) opinion, *Adtranz, ABB Daimler-Benz Transportation*, 331 NLRB 291 (2000), and used it to explain why it broadened its good faith inquiry on reconsideration. The problem is that, if that principle applies to the parties' relationship, it does not derive from the CBA but, rather, from an external source of law. OUS's complaint is based on ORS 243.672(2)(d), which requires a violation of the "provisions of [a] written contract," not statutory or common-law principles. OUS has not cited any evidence, and we have found none, supporting the proposition that these parties expected that general labor law rights and obligations would be enforced by means of a duty implied in their CBA. *See Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 354, 876 P2d 761 (1994) (holding, in rejecting party's argument that "its reasonable expectations also included the law that was applicable" at the time the contract was signed, that "the duty of good faith operates *to effectuate the reasonable expectations of the parties* as determined under the terms of their contract" (emphasis in original)).

For the foregoing reasons, it is not appropriate to imply a prohibition against e-mail communication between OPEU and OUS employees who are union members in order to enforce the parties' "agreed common purpose" and their "justified expectations" *under the CBA*. Accordingly, we conclude that ERB erred in determining that OPEU breached its duty of good faith and fair dealing under the CBA.

In its remaining cross-assignment of error, OUS asserts that ERB erred in concluding that OPEU did not refuse to accept the second arbitrator's decision because the arbitrator necessarily ruled that OPEU did not have the right to use OUS's e-mail system and that OPEU's continued use of e-mail constituted a refusal to accept that aspect of the arbitrator's decision. OPEU responds that, because the issue before the arbitrator was whether OUS, not OPEU, violated the CBA, the arbitrator had no authority to direct OPEU to refrain from its activities. Further, OPEU asserts, the award

itself directed only that OPEU's grievance be dismissed, nothing more.

We examined the scope of an arbitrator's decision for purposes of ERB review in *Deschutes Cty. Sheriff's Assn. v. Deschutes Cty.*, 169 Or App 445, 9 P3d 742 (2000), *rev den*, 332 Or 137 (2001). There, a county sheriff's association filed an unfair labor practice complaint alleging that the county had failed to comply with an arbitration award. The arbitration award ordered reinstatement of a corrections officer who was suspended for an incident involving the use of a chemical agent to restrain an inmate. The arbitrator concluded that the conduct for which the officer was disciplined did not furnish just cause for suspending the officer. The arbitrator also found that the officer had engaged in other misconduct but, because *that* misconduct was not the reason given for discipline, it was beyond the scope of arbitration under the CBA. The county asserted that it did not have to comply with the arbitrator's award by reinstating the officer because to do so would violate public policy.

ERB relied on the arbitrator's finding of other misconduct to conclude that the county's refusal to comply with the arbitration award was not an unfair labor practice. We reversed, explaining that "[f]indings made beyond the scope of [the CBA] are not within the arbitrator's jurisdiction, and, consequently, no award may be entered based on such findings." *Deschutes Cty. Sheriff's Assn.*, 169 Or App at 454. We noted that the CBA limited the arbitrator to the determination of whether the officer engaged in the conduct for which he was disciplined. *Id.* at 454-55. We accorded the arbitrator's other "gratuitous findings" no legal significance. *Id.* at 454.

Here, OPEU filed a grievance requesting a determination of whether OUS violated the CBA. The arbitrator defined the issue before him as whether *OUS* had violated Article 10, Section 4. Once the arbitrator determined that OUS had not violated the CBA, he did not have the authority to make any award regarding OPEU's conduct. ERB correctly determined that any award regarding OPEU's possible contract violation would have been beyond the scope of the parties' submissions. *See Eugene Educ. Assoc. v. Eugene*

*School Dist. 4J*, 58 Or App 140, 147, 648 P2d 60 (1982) (arbitrator's determination that no contract violation occurred "divested him of authority to make any award").

Further, as ERB noted, the arbitrator's award consisted only of the dismissal of OPEU's grievance. Contrary to OUS's assertions, the inclusion of the phrase "for the reasons set forth above" in the award section does not, and could not, incorporate the arbitrator's other findings as part of the award. That phrase is merely a style of concluding an opinion, a reference to the decision's rationale. It does not direct any action or remedy. We therefore affirm ERB's ruling that OPEU did not commit an unfair labor practice by reason of refusing to abide by the arbitrator's decision.

In sum, although we affirm ERB's conclusions on the express breach and arbitration issues, we reverse ERB's order because we conclude that OPEU did not commit an unfair labor practice by breaching its duty of good faith and fair dealing.

Reversed.