Argued and submitted September 7, affirmed December 6, 2006

SERVICE EMPLOYEES INTERNATIONAL UNION
LOCAL 503,
Oregon Public Employees Union,
*Petitioner,*

*v.*

STATE OF OREGON,
JUDICIAL DEPARTMENT,
*Respondent.*

UP-52/62-03; A130742

149 P3d 235

Affirmed.

Giles Gibson argued the cause for petitioner. On the brief was Elizabeth Baker.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Petitioner, Service Employees International Union Local 503 (SEIU), seeks judicial review of the final order of the Employment Relations Board (ERB) in an unfair labor practice case. *Service Employees International Union, Local 503 v. State of Oregon, Judicial Department,* 21 PECBR 98 (2005). ERB concluded that respondent Oregon Judicial Department (OJD) had not committed an unfair labor practice, ORS 243.672(1)(a), in admonishing an employee who used OJD's e-mail system to invite a coworker to a union organizational meeting. 21 PECBR at 116.[1] On judicial review, SEIU challenges ERB's determination that OJD had not engaged in discriminatory enforcement of its policies governing permissible use of its e-mail systems. We review for legal error, ORS 183.482(8)(a), and affirm.[2]

SEIU does not challenge ERB's findings of material fact. Those facts are as follows: In early September 2003, Sutton, an OJD employee working at the Multnomah County Circuit Court, sent an e-mail via OJD's e-mail system to a coworker, Maldonado, inviting him to a meeting concerning SEIU's efforts to organize OJD employees.[3] The next day, Maldonado reported the e-mail to his supervisor, Multnomah County Circuit Court Trial Court Administrator, Doug Bray. Bray believed that Sutton's e-mail violated OJD's policy regarding permitted "use of publicly owned equipment." Consequently, on September 5, 2003, Bray spoke with Sutton and admonished her not to use OJD's e-mail system to communicate about union organizing efforts.

---

[1] One member of ERB joined in the majority and filed a separate concurrence, 21 PECBR at 119 (member Thomas, concurring), and chairperson Gamson dissented from the board's analysis and disposition of the matter presented for judicial review. *Id.* at 120 (chair Gamson, concurring and dissenting).

[2] Because the judges of this court were and are subject to the policies described below, we invoke the rule of necessity to decide the appeal. *See generally Oregon State Police Officers' Assn. v. State of Oregon,* 323 Or 356, 361 n 3, 918 P2d 765 (1996) (court invoked rule of necessity to decide case involving Public Employees' Retirement Fund in which judges participated).

[3] Maldonado deleted the message, and its exact content is not disclosed in the record. ERB found that Sutton sent the e-mail to Maldonado only, and not to a group, but made no finding as to whether the e-mail was sent during business hours.

On September 29, 2003, SEIU filed an unfair labor practice complaint. In that complaint, SEIU alleged that OJD had violated ORS 243.672(1)(a)[4] by "ordering * * * employees not to use e-mail to discuss the Union, while allowing the use of e-mail for other non-work related discussions."[5]

In September 2003, OJD's policy governing "Use of Publicly Owned Equipment" provided, in pertinent part, as follows:

"OJD's general policy is to use publicly owned equipment for business purposes only and in a cost-effective manner.

"At the same time, OJD strives to provide a supportive work environment for employees and judges and recognizes that situations exist (such as in Section I. below) where limited personal use is allowable and appropriate.

"**I.   Allowable Personal Use**

"OJD recognizes two narrowly defined exceptions to the general policy of 'business use only.'

"**A.   Personal Use During Nonwork Time**

"Personal use is allowable during nonwork time **if all** of the following conditions are clearly met:

"•  *the use is not improper (as defined in Section II. below),*
"•  *the use does not result in economic benefit,*
"•   the use results in no cost, or in de minimis additional cost (excluding reimbursement cost) to the OJD or state, and
"•   the use is minimal and insignificant in terms of time or quantity.

---

[4] ORS 243.672(1) provides, in part:

"It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"(a) Interfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662."

*See generally Portland Assn. Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 623, 16 P3d 1189 (2000) (describing proper application of ORS 243.672(1)(a)).

[5] That matter was subsequently consolidated with a second unfair labor practice complaint by SEIU against OJD pertaining to conduct in Multnomah County. SEIU does not challenge ERB's disposition of the second matter.

## "B. Personal Use During Work Time

"Personal use is allowable during work time **only if all** of the above conditions are clearly met, and

"• the use is essential and brief,
"• the use cannot reasonably wait until nonwork time, and
"• the administrative authority has not prohibited the type of use."[6]

(Boldface text in original; emphasis added.)

Section II of the policy, entitled "Improper Use," in turn provided, in pertinent part, as follows:

"Improper use at any time (work time or nonwork time) includes:

"• violating any law or OJD rule or policy;

"• conducting any illegal activity or unlawful communication;

"• revealing or publicizing proprietary or confidential information;

"• representing personal opinions as those of OJD;

"• exposing OJD to unnecessary liability of any kind;

"• using for economic benefit (including operating or supporting a personal business);

"• *personal lobbying, soliciting, recruiting, selling or persuading, for or against, commercial ventures, products, religions, or political causes or organizations;*

"* * * * *

"This list is intended to provide examples of improper use; it is not necessarily exhaustive or complete."[7]

---

[6] The policy included the following additional qualification:

"This policy acknowledges that business transactions may include social and personal components. For example, a business conversation using public equipment (e.g., telephone, e-mail, fax, Internet) may include some limited and appropriate personal interaction of the type that would normally occur between persons in the world of work."

[7] The policy also included prohibitions against use of OJD computer equipment for, *inter alia,* "unprofessional, false, indecent, lewd, tasteless, or discriminatory

(Emphasis added.)

OJD's policy also included operative definitions of "improper use" and "personal use." "Improper use" was defined as "[i]llegal, unethical, inappropriate, or unauthorized use of publicly owned equipment as delineated in Section II [the Improper Use section]." "Personal use" was defined as "[u]sing equipment for purpose other than authorized OJD work."

To summarize:

(1) Under OJD's policy, all potential use of publicly owned equipment fell into either of two mutually exclusive categories: "business use" or "personal use." Although the policy did not define "business use," it did define "personal use"—and, logically, given the latter definition, "business use" necessarily meant "using equipment for purposes of authorized OJD work."

(2) Under OJD's policy, "business use" was permitted, but "personal use" was prohibited unless it fell within the

---

remarks," "downloading, viewing, storing, copying, or transmitting any pornographic, sexually explicit, or sexually oriented materials," and gambling.

In May 2005, while this matter was still pending before ERB, OJD amended the emphasized language of the policy's "Improper Use" provision to state that "improper use" includes:

> "• (except as provided in A. and B. below) personal lobbying, soliciting, recruiting, selling or persuading, for or against, commercial or noncommercial ventures, products, organizations, religions, or political causes;

> "**Exception A:** Authorized Charitable Drive
> "The Chief Justice or State Court Administrator may authorize a statewide—and an administrative authority may authorize a local—charitable event, organization, or effort. In any such case, internal communication to OJD staff and judges will be considered as work-related. Statewide examples include the Governor's Food and Toy Drives and the Charitable Fund Drive.

> "**Exception B:** Designated OJD Physical Space for Personal Use
> "An administrative authority may designate de minimis OJD physical surface space for limited and appropriate personal use by employees and judges. Such space could include a bulletin board or other surface space in a lunch room or other appropriate workspace not normally accessible to the public. Uses could include a posting of personal (i.e., noncommercial) items for sale; notice of an employee/judge garage/yard sale; short-term local school or other appropriate fund raiser (e.g., magazine drive or Girl Scout cookie order forms) so long as participation is clearly voluntary; a community event notice where an employee or judge is involved; and the like.

> "If such space is designated, the administrative authority may promulgate a more detailed or more limited use policy (which might outline the approval process and time limitations) that is not otherwise in conflict with this policy."

(Boldface text in original.) That amended version of the policy is currently effective.

defined exceptions for "allowable personal use," *viz.*, either "personal use during nonwork time" or "personal use during work time." Common to the policy's definition of either species of "allowable personal use"—and central to the dispute here—was the requirement that the use "is not improper" as defined in Section II of the policy. Thus, if the use of the public equipment (including e-mail) was a defined "improper use," it could not be an "allowable personal use"—and, consequently, was prohibited under the policy.

OJD's construction and enforcement of the policy's "improper use" provision was the focus of the proceedings before ERB. At the hearing before the administrative law judge (ALJ), SEIU advanced two principal, and alternative, contentions. First, SEIU asserted that Sutton's e-mail did not violate OJD's policy.[8] Second, even if there was a violation, OJD, through Bray, engaged in discriminatory and selective enforcement of its policy, precluding union-related communications while routinely permitting or acquiescing in otherwise ostensibly prohibited personal use of its e-mail system.

In seeking to substantiate the latter, "discriminatory enforcement" contention, SEIU adduced evidence at the hearing pertaining to OJD employees' use of the e-mail system for personal purposes, including for various solicitations,

---

[8] SEIU contended, in part, that the policy's "improper use" provision did not, by its terms, preclude all solicitations on behalf of organizations. Rather, in SEIU's view, the "anti-solicitation" language applied only to solicitations for "political causes or political organizations"—and the union was not a "political organization." SEIU did not renew that contention in briefing or argument to ERB on OJD's objections to the ALJ's proposed order or in its brief on judicial review.

At oral argument on judicial review, we raised questions concerning the proper syntactical construction of the "anti-solicitation" language of the version of OJD's policy in effect in September 2003. Specifically, we asked whether the then-extant policy precluded only solicitations on behalf of *"political"* organizations, and we invited submissions by the parties on that question. However, and notwithstanding our *sua sponte* exploration of that issue, we determine that the matter is not preserved for our review. As described more fully below, a contention that conduct is not prohibited under a policy is qualitatively different from a contention that an employer's enforcement of that policy against ostensibly prohibited conduct is impermissibly selective and discriminatory. The latter contention was preserved for our review; the former was not.

We note finally, and parenthetically, that the subsequently amended version of the "improper use" provision of OJD's policy, *see* 209 Or App at 501-02 n 7, unambiguously prohibits "personal lobbying, [or] soliciting * * * for or against * * * organizations, religions, or political causes."

and OJD's response to such communications. Based on that evidence, ERB ultimately rendered the following findings of fact, which are not disputed on judicial review:[9]

"10. Department employees commonly use e-mail for a variety of purposes, work-related and otherwise, including messages regarding celebrations, surprise parties, condolences, parties, showers, lunch and dinner dates, retirement parties, going away parties, post-work gatherings, jokes, photos, and communications with family and friends during the day. The Department regards communications regarding anniversaries, retirements, promotions, transfers, team-building functions, and other moral[e]-related activities as work related.

"11. In testimony offered by the Union, Department employees who work in Multnomah County testified generally that they have often e-mailed solicitations to each other to buy school fund-raising candy bars and wreaths, Avon products, tickets to professional sporting events, and household appliances, but that Multnomah County managers were generally not aware of these e-mails. However, the record is not replete with specific examples which support these generalities. At most, we find that on a number of occasions in Multnomah County, Department e-mail facilities were used to communicate regarding topics of a personal nature. We do not find that this limited usage was explicitly condoned by the Department.

"12. When the Department discovered employees using the e-mail system to obtain a direct financial benefit, the local trail [sic] court administrator has admonished the employees to stop. Similarly, the Department has advised local trial court administrators to stop e-mail solicitations such as an employee's solicitation for other employees to pay to take her yoga class, a dog groomer seeking clients, and solicitations to attend a Pampered Chef cookware sale/party. * * *

"* * * * *

"14. As previously noted, the Department and local trial court administrators have approved the use of e-mail

---

[9] SEIU, in its second assignment of error on judicial review, does take issue with ERB's "rulings" characterizing those facts or their implications. However, we do not understand SEIU to contend that the quoted portions of ERB's findings are unsupported by substantial evidence.

to solicit funds and in-kind contributions for Governor and Department-approved charity drives, such as the Governor's charitable fund drive, Governor's food drive, and Governor's toy drive, and funds for the Oregon Food Bank and a needy family program. As part of that charity work, offers of modest prizes and incentives were communicated to all Department employees in Washington County through the e-mail system. However, the Department admonished employees to refrain from solicitations for outside charities, such as the Make-a-Wish Foundation.

"15.   In interpreting the rule for a county court administrator, [OJD Personnel Director Gary] Martin said that he did not think it was appropriate for court staff to solicit contributions for donations to a 911 firefighters fund. However, some circuit courts have permitted employees to solicit for local charities.

"16.   The Multnomah County Circuit Court Criminal Arraignments unit used e-mail to plan and promote social gatherings outside work that the supervisor considered team building. These included pot-luck meals and happy-hour gatherings."

21 PECBR at 105-07.

The ALJ, in his proposed order, concluded that OJD had impermissibly selectively enforced its policy regarding use of publicly owned equipment against union-related communication:

"In a [ORS 243.672(1)(a)] case, a finding of different treatment undercuts the employer's defense that employee communication about the terms and conditions of employment causes an undue burden or disruption in the workplace, and therefore the statutory rights of the employees must yield to the constraints required by the work. *For this purpose, the appropriate comparison is between the employer's treatment of union-related speech and its treatment of other nonwork-related speech, whether that speech is related to other organizations or not.*

"Accordingly, neither this Board nor the NLRB has required a comparison only between employee union-related communication and employee communication related to other organizations to determine whether restrictions on employee union-related communication are inappropriate. *The general rule is that an employer may bar all*

*personal communication in the workplace during work
time, but once it permits personal communication between
those employees, it cannot deny employees the right to com-
municate about union-related issues in the same fashion.*

"* * * * *

"* * * [Alternatively,] [t]he Union proved that the
Department permitted extensive e-mail on personal mat-
ters, and extensive e-mail containing solicitation and per-
suasion regarding contributions to several charity efforts.
Encouraging nonwork-related charity communication of
which it approved, while suppressing Union-related com-
munications, represented different treatment."[10]

(Footnotes omitted; emphasis added.)

OJD filed extensive objections, and ERB, dividing
2-1, rejected the ALJ's proposed disposition. The majority
opinion first adopted modifications of the ALJ's proposed
findings of fact and then reasoned that the evidence failed to
establish discriminatory enforcement. At the core of the
majority's analysis is the implicit rejection of the ALJ's first
premise, *viz.*, that, if an employer permits *any* nonbusiness or
personal use of its property, it must permit access for union-
related communications—and any failure to do so is, neces-
sarily, an unfair labor practice:

"[W]e start with the proposition that the Department's
rules on the use of employer equipment, as enunciated by
Mr. Bray, are presumptively valid. *The Union argues that it
need show only that the Department allows personal com-
munications in the workplace while barring Union commu-
nications. It is not that simple.* Employees do not have a
statutory right to use employer equipment to communicate
on union matters.

"We then ask whether the Department policy has been
applied by Mr. Bray in a discriminatory manner, thereby
rebutting the presumption of validity. As stated above, the
rule is that if the employer allows personal use of its equip-
ment, then it may not restrict uses related solely to union

---

[10] Given that analysis and disposition, the ALJ did not address SEIU's conten-
tion that the policy "properly construed, bars only political organizational work[.]"
*Cf.* 209 Or App at 501-02 n 7.

activities. However, this formulation only moves the dispute downstream, to the questions of what is 'personal use' and what are 'nonwork related activities?' The cases are all over the map. In this area of the law we look to the private sector. It is of little assistance. The NLRB has issued a number of opinions on these points which are quite fact specific and difficult to reconcile, to say the least.

"* * * * *

"* * * [W]e hold that the Union has not introduced sufficient evidence of 'personal use' to overcome the presumption that the employer's policy is valid. The Department's policies do not discriminate against union-related messages. They do not prohibit only union communications. When the Department discovered employees using the e-mail system to obtain a direct financial benefit, it admonished the employees to stop. The Department has acted to stop e-mail solicitations such as an employee's solicitation for other employees to pay to take her yoga class, a dog groomer seeking clients, and solicitations to attend a Pampered Chef cookware sale/party. * * *

"As previously noted, the Department approved use of e-mail to solicit funds and in-kind contributions for Governor and Department-approved charity drives, such as the Governor's charitable fund drive, Governor's food drive, and Governor's toy drive, and funds for the Oregon Food Bank and a needy families program. As part of that charity work, offers of modest prizes and incentives were communicated to all Department employees through the e-mail system. However, the Department admonished employees to refrain from solicitations for outside charities, such as the Make-a-Wish Foundation.

"For purposes of this case, and based on the record presented here, we conclude that the 'team building' activities encouraged by the Department in Multnomah County are not 'personal' communications of the sort which would render unlawful the Department's ban on union-related e-mail, thereby rebutting the presumption of validity the Department's policy otherwise enjoys. The same is true of the Department's use of e-mail to solicit funds and contributions for Governor and Department-approved charity drives. Both kinds of communications are treated by the employer as work related. We agree with those characterizations."

21 PECBR at 115-16 (citation omitted; emphasis added).[11]

Board chair Gamson dissented, asserting both that "[t]he majority's conclusion does not rationally follow from its Findings of Fact" and that the majority's legal reasoning was "fatally flawed." 21 PECBR at 123. The dissent began by emphasizing the importance of e-mail as a tool for organizing employees at multiple physically separate and distant work sites. *Id.* at 121-22. Then, as with the ALJ's proposed order, the dissent proceeded from the premise that, "[u]nder the well-established rule of law, the employer may not allow personal e-mail use but prohibit e-mails about union-related matters." *Id.* at 125. In that regard, the dissent particularly criticized, as "inapt," the majority opinion's reference to OJD's enforcement efforts against messages concerning "outside commercial ventures." *Id.* Finally, the dissent posited distinctions between the circumstances of other cases and the breadth of OJD's allowance of personal use here. *Id.* at 126-28.[12]

On judicial review, SEIU contends principally that, because OJD routinely allowed use of its e-mail system for other nonbusiness and personal messages, its enforcement of the policy in this instance was impermissibly discriminatory against union-related communications, in violation of ORS 243.672(1)(a). ERB's contrary conclusion, SEIU asserts, is erroneous both as a matter of substantial reason and of law.

As explained below, we disagree for three conjunctive reasons. *First*, OJD's allowance of certain, expressly limited types of nonbusiness uses of its e-mail system does not necessarily compel OJD to open its system to union-related communications. Rather, so long as OJD (1) prohibits non-business-related uses that are categorically substantively

---

[11] Member Thomas, who joined in the majority opinion, also separately concurred. The concurrence asserted, in part, that, although this case involved a single e-mail sent to a single recipient, there are "legitimate business concerns" peculiar to the public employment context that justify public employers prohibiting the use of their e-mail systems as part of a "broad attempt" to solicit union membership. 21 PECBR at 119-20.

[12] Both the majority opinion, 21 PECBR at 115-16, and the dissent included comprehensive examinations not only of ERB precedent but also of decisions of the National Labor Relations Board (NLRB) and federal courts addressing analogous disputes.

analogous to union solicitation efforts and (2) enforces those prohibitions in a consistent and rational manner, there is no impermissible "discrimination" against union-related speech. *Second*, SEIU, as the complainant, had the burden of proving its unfair labor practice complaint—and, particularly, of establishing that OJD had, in fact, engaged in discriminatory enforcement of its policy governing use of public equipment. *Third*, ERB did not err in concluding that, on this record, SEIU failed to sustain its burden of proof. As ERB determined, SEIU failed to establish that, except in isolated or rare instances, OJD managers had expressly approved or knowingly acquiesced in the use of the e-mail system for personal or nonbusiness-related organizational solicitations. To the contrary, substantial evidence established that OJD's managers routinely enforced the "anti-solicitation" prohibition, regardless of the content of the solicitation.

We begin by reiterating the scope of the core dispute on judicial review. Given the procedural posture, we assume, necessarily, that Sutton's e-mail was not "allowable personal use" within the policy's express terms. *See* 209 Or App at 503 n 8. Rather, we understand SEIU to advance two alternative contentions pertaining to discriminatory enforcement: (1) Because OJD's policy permitted some nonbusiness uses of its e-mail system, it was required, as a matter of law, to permit usage for union-related messages. (2) In all events, because OJD had not consistently enforced the policy's "anti-solicitation" prohibition, enforcement against Sutton's e-mail constituted impermissible discrimination against union-related communication.

The first of SEIU's arguments rests on an erroneous legal premise, and the second on an unsubstantiated factual premise. We address each in turn.

No Oregon appellate case has addressed whether or in what circumstances, in the absence of a collective bargaining agreement, an employer's preclusion of the use of its e-mail system for union-related messages constitutes an unfair labor practice. *Accord OUS v. OPEU*, 185 Or App 506, 60 P3d 567 (2002) (the union's communication with union members via the employer's e-mail system neither violated the express terms of the collective bargaining agreement nor

breached an implied duty of good faith and fair dealing and, thus, did not constitute an unfair labor practice under ORS 243.672(2)). Nevertheless, the parties agree—as did ERB's majority and dissenting opinions—that, "[a]s a general rule, employees do not have the right to use the employer's equipment to communicate about union matters." 21 PECBR at 122 (chair Gamson, dissenting). *See generally Adtranz, ABB Daimler-Benz*, 331 NLRB 291, 293 (2000) ("It is well established that there is no statutory right of an employee or a union to use an employer's bulletin board. * * * Similarly, there is no statutory right of an employee or a union to use an employer's telephone for personal or nonbusiness purposes.").

That principle, however, may be qualified—or even abrogated—if the employer permits, or knowingly does not preclude, nonbusiness or personal use of its property. The question presented here is in what circumstances, and to what extent, does an employer's express allowance or knowing nonpreclusion of certain nonbusiness or personal uses of its property compel the employer to permit usage for union-related messages? As the ERB majority observed, the decisions of the NLRB and of various federal courts are "all over the map" on that question. 21 PECBR at 115.

In *Adtranz*, the NLRB endorsed an "absolutist" analysis. In that case, the union contended that the employer had violated the National Labor Relations Act (NLRA) by, *inter alia*, adopting and selectively enforcing a rule stating that its e-mail systems were "for business use only." 331 NLRB at 293. Specifically, the union asserted that the employer had allowed personal messages notwithstanding its rule and, consequently, was obligated to permit union-related communication. *Id.* The NLRB, adopting the ALJ's analysis, agreed:

"[O]nce an employer grants the privilege of occasional personal use of the telephone during worktime, it may not lawfully exclude union activities as a subject of discussion.

"Analogously, Respondent could bar its computers and E-mail system to any personal use by employees. In this case, Respondent did permit E-mails of a personal nature,

notwithstanding its rule. Therefore, Respondent could not exclude the union as a topic of discussion."[13]

*Id.* (citations omitted).

In *N.L.R.B. v. Honeywell, Inc.*, 722 F2d 405 (8th Cir 1983), the court enforced an NLRB order applying the same analysis. There, the employer maintained both "company" and "employee" bulletin boards, which were subject to specific restrictions:

"The Honeywell manager of employee services is in charge of the company and employee bulletin boards and is responsible for enforcing Honeywell's rules relating to their use. All notices for the company board must be approved prior to posting. The company bulletin board is for business-related notices as well as for notices concerning 'company-sponsored or company-approved' organizations and activities. Such organizations and activities run the gamut from United States Savings Bonds to Boston Pop[s] Orchestra concerts to United Way campaigns. In contrast, the employee bulletin board is limited to personal messages, for example, for sale notices, car pool information, lost and founds, and the like. The posting of notices relating to political, religious or group activities that are not company sponsored, however, is prohibited."

*Id.* at 406 (footnote omitted). An employee requested approval to post an announcement of a union-related meeting, apparently on either of the bulletin boards, and the personnel manager denied that request. The union filed an unfair labor practice complaint, which the NLRB sustained:

"The Board * * * reasoned that once an employer permits employees to post some notices that are not related to work, then the employer may not validly discriminate against union related material. Honeywell permits its employees to post personal messages and, more importantly, permits notices to be posted of *some* organizations and activities, *i.e.*, those of which it approves or those it sponsors. The Board concluded that these exceptions make the prohibition of union-related materials discriminatory."

---

[13] Notwithstanding the breadth of that premise, the NLRB in *Adtranz* ultimately concluded that there was no unfair labor practice because there was "no evidence that [the employer had actually] prohibited union discussions on its E-mail system." 331 NLRB at 293.

*Id.* (citations omitted; emphasis in original).

On appeal, the employer argued that its rejection of the union-related posting was neutral, as consistent with its general preclusion of notices relating to "political, religious, or group activities that are not company sponsored," *id.* at 406, and not discriminatory. Specifically, the employer contended that the limited "exception[ ] for personal notices and company organizations" did not render the preclusion of other messages not falling within that exception *"per se* discriminatory." *Id.* at 407. The Eighth Circuit was unpersuaded, deferring to the NLRB's determination that "no legitimate employer interest in limiting access to its bulletin boards outweighs the employees' * * * rights of communication" embodied in section 7 of the NLRA, 29 USC section 157. *Id.*; *see also Union Carbide Corp. v. N.L.R.B.*, 714 F2d 657, 660 (6th Cir 1983) ("[W]here, by policy or practice, the company permits employee access to bulletin boards *for any purpose*, section 7 of the [NLRA] secures the employees' right to post union materials." (Emphasis added.)).[14]

Conversely, in *Guardian Industries Corp. v. N.L.R.B.*, 49 F3d 317 (7th Cir 1995), the court adopted and applied a qualitatively different and more nuanced analysis. There, the employer maintained a bulletin board on which the only permissible nonbusiness messages were employees' "swap-and-shop" notices on 3 x 5 cards announcing items such as "used cars for sale." *Id.* at 318. During a union organizational campaign, employees sought to post union-related messages on the bulletin board, and the employer refused. *Id.* The NLRB sustained the consequent unfair labor practice complaint, but the Seventh Circuit declined to enforce that aspect of the board's disposition.

The court began by summarizing the NLRB's reasoning:

"According to the [ALJ], whose opinion the Board adopted, whenever the employer permits employees the slightest

---

[14] *Accord Roadway Exp., Inc. v. N.L.R.B.*, 831 F2d 1285 (6th Cir 1987) (enforcing NLRB's order that, where employer had "no rules about what material could be posted" on two break room bulletin boards and employees had, in fact, posted "notices of upcoming events, sales and meetings[,]" employer's removal of bulletin boards after employees posted union-related material violated NLRA).

access to a bulletin board, it must permit the posting of union notices; anything else is forbidden 'discrimination' against the employees' right to organize."

*Id.* at 318; *see also id.* at 319 (characterizing "antidiscrimination principle" underlying the "Board's rule": "[G]iving the employees *any* access to a bulletin board requires the employer to accept notices relating to labor organization." (Emphasis in original.)).

The court then addressed the meaning of "discriminatory enforcement" in this context. Specifically, noting that discrimination necessarily implicates a comparison, the court grappled with the potentially question-begging exercise of identifying the proper comparative referent:

"Discrimination is a form of inequality, which poses the question: 'equal with respect to *what?*'. A person making a claim of discrimination must identify another case that has been treated differently and explain why that case is 'the same' in the respects the law deems relevant or permissible as grounds of action. * * * [I]t is hard to see why allowing employees to tell each other about cribs that have been outgrown implies that the employer must dedicate space to the union's organizational notices."

*Guardian Industries Corp.*, 49 F3d at 319 (emphasis in original).

The court ultimately concluded that the proper referent in assessing "discriminatory enforcement" was not (as the NLRB posited) whether the employer permitted *any* non-business or personal use of its property but, instead, whether the allowed use was categorically, substantively similar to the precluded union-related communication (*e.g.*, organizational solicitation):

"[Employer] does not now, and apparently never did, allow general announcements of meetings. The Boy Scouts, the Kiwanis, the VFW, the Red Cross, the United Way, the employee credit union, local schools and churches—and meetings promoting and opposing unions—were and are uniformly excluded from its bulletin board. We therefore must ask in what sense it might be discriminatory to distinguish between for-sale notes and meeting announcements.

"* * * * *

"Courts evaluating claims of discrimination search for disparate treatment and sometimes for disparate impact. A rule distinguishing pro-union organization from anti-union organization would be disparate treatment. A rule banning all organizational notices (those of the Red Cross along with meetings pro and con unions) is impossible to understand as disparate treatment of unions. * * *

"* * * [T]he Board's rule depends on the proposition that once a bulletin board is open to any notices from employees, it is 'discrimination' not to accept meeting announcements. The Board asks us to accept an understanding of 'discrimination' that has been considered, and found wanting, in every other part of the law that employs that word. * * * The Board treats the definition of 'discrimination' as something obvious. All that we find obvious is that the Board's view is idiosyncratic."

*Guardian Industries Corp.*, 49 F3d at 319-20;[15] *see also 6 West Ltd. Corp. v. N.L.R.B.*, 237 F3d 767, 780, 780 n 18 (7th

---

[15] In so holding, the court relied, in part, on its understanding of *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 US 37, 103 S Ct 948, 74 L Ed 2d 794 (1983). In *Perry Ed. Assn.*, the Court held that the employer school district had not violated either the First Amendment or the Equal Protection Clause of the Fourteenth Amendment by entering into a collective bargaining agreement that provided that the incumbent union would have exclusive access to the district's interschool mail system and teacher mailboxes, precluding access by any other union. As part of its constitutional analysis, the Court rejected the petitioner union's argument that the interschool mail system and teacher mailboxes should be deemed a "limited public forum" because the district had not precluded access by certain "outside organizations":

"Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material. We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum. * * *

"Moreover, even if we assume that by granting access to the Cub Scouts, YMCA's, and parochial schools, the School District has created a 'limited' public forum, the *constitutional right of access would in any event extend only to other entities of similar character. While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys' club, and other organizations that engage in activities of interest and educational relevance to students, they would not as a consequence be open to an organization such as PLEA, which is concerned with the terms and conditions of teacher employment.*"

460 US at 47-48 (emphasis added). Although *Perry Ed. Assn.* did not involve any alleged violation of the NLRA, the court in *Guardian Industries Corp.* regarded the emphasized language as being instructive. *See Guardian Industries Corp.*, 49 F3d

Cir 2001) (declining to enforce NLRB order that employer had committed unfair labor practice by issuing written warnings to employees for union solicitation activity on employer's property; concluding that, although employer had permitted employees to engage in on-premises solicitation for, *inter alia*, Girl Scout cookies, raffle tickets, and Christmas ornaments, there was no unlawful discrimination because those solicitations were not "similar" to union solicitations; noting, further, that employer "would discriminate in the enforcement of its non-solicitation policy if it prohibited union solicitation but allowed employees to solicit business, political, religious, or other association membership").[16]

In this case, ERB subscribed to *Guardian Industries Corp.*'s "nonabsolutist" approach. OJD's policy explicitly permitted certain types of nonbusiness or personal use of its e-mail system, and ERB found that OJD employees "commonly" used the system for such purposes. Nevertheless, ERB did not conclude that those circumstances established a right of access for union-related messages. Rather, ERB proceeded from the legal premise that, notwithstanding that OJD had opened its system to limited nonbusiness or personal uses, the "anti-solicitation" prohibition remained enforceable unless OJD managers, as a matter of practice, expressly allowed or knowingly acquiesced in violations of that prohibition.

ERB correctly framed the legal analysis. The reasoning of *Guardian Industries Corp.* is not just provocative; ultimately, it is compelling. Bright-line methodologies like *Adtranz*'s "in for a penny, in for a pound" approach are, of course, easy to apply. But, with respect, they can also be mindless.[17] In the context of reconciling employers' property

---

at 321 ("None of the appellate opinions singing the Board's tune discusses *Perry*, and the Board itself has been conspicuously silent about that decision.").

[16] *Accord N.L.R.B. v. Southwire Co.*, 801 F2d 1252, 1256 (11th Cir 1986) (noting that, given evidence "refut[ing] the company's position that it consistently policed the [bulletin] boards and uniformly enforced its rules relating to them," "[w]e do not need to adopt the Board's argument that once a bulletin board is made available for any designated type of non-work related notice the employer may exercise no control over content and employees ipso facto have an unlimited right to post union materials").

[17] For example, under the NLRB's approach in *Adtranz* and other cases, if an employer had a policy that its telephone and e-mail systems were "for business use

rights with employees' rights of organization, representation, and collective bargaining, a more searching—a more reasoned—analysis is required.

Our review thus reduces to whether ERB properly applied that construct to this dispute. As noted, OJD, through Bray, the trial court administrator, regarded and treated Sutton's e-mail as an explicitly prohibited "improper use" falling within the prohibition against

> "personal lobbying, soliciting, recruiting, selling or persuading, for or against, commercial ventures, products, religions, or political causes or organizations[.]"

ERB concurred in that characterization of Sutton's e-mail—that is, that the e-mail fell within a broader, categorical restriction against uses of the employer's property that was not limited to union-related communications. On judicial review, we do not understand SEIU to challenge *that* aspect of ERB's analysis. Rather, SEIU contends that OJD has failed to enforce that prohibition against other sorts of solicitations and, thus, preclusion of union-related messages is impermissibly discriminatory.

SEIU's position founders on the allocation of the burden of proof and on the content of this record. As the proponent of the unfair labor practice complaint, SEIU had the burden of proof. *See* OAR 115-035-0042(6) (in unfair labor practice complaints before the Employment Relations Board, "[t]he complainant shall have the burden of proof and shall also have the burden of going forward with the evidence"). Specifically, with respect to its allegation of discriminatory enforcement, SEIU was obligated to adduce evidence demonstrating that OJD had, as a matter of practice, either explicitly approved or knowingly acquiesced in the use of its e-mail systems for nonbusiness-related solicitations prohibited under its policy. ERB correctly determined that SEIU failed to make that showing.

ERB's pertinent findings of fact, numbers 10-12 and 14-16, are set out above. *See* 209 Or App at 504-05. SEIU does

---

only," with a single exception for family-related communications, that exception would compel the employer to allow access to its systems for union-related communications.

not contend that any of those findings is unsupported by substantial evidence. Those findings disclose that, as a matter of practice—and with the exception of specific "department-approved charity drives" (addressed below)—when OJD managers became aware of the use of its e-mail system for personal or organizational solicitations, they routinely acted to enforce the anti-solicitation prohibition. Consequently, and necessarily, SEIU failed to show that OJD routinely "honored" the anti-solicitation prohibition "in the breach."

ERB found that OJD did routinely and explicitly approve communications soliciting participation in "Department-approved charity drives, such as the Governor's charitable fund drive, Governor's food drive, and Governor's toy drive, and funds for the Oregon Food Bank and a needy family program." However, ERB concluded that, given the context, *viz.*, that the charitable drives were an intramural activity, communications regarding those drives were properly characterized as "business-related." SEIU does not dispute that determination. Consequently, OJD's approval—indeed, sponsorship—of those solicitations was not indicative of discrimination but, instead, constituted explicitly permitted use of OJD's system for "business purposes."[18]

In sum, ERB did not err in concluding, on this record, that SEIU had failed to prove discriminatory enforcement in violation of ORS 243.672(1)(a). The disputed e-mail violated OJD's general prohibition against use of its equipment for non-business-related solicitations, and SEIU failed to establish that OJD's enforcement of that prohibition in this instance deviated from its routine practice with respect to other, non-union-related communications.

Affirmed.

---

[18] We note that ERB, in finding 15, did find that "some circuit courts have permitted employees to solicit for local charities." However, ERB made no finding with respect to the extent or frequency of such conduct. With the exception of one instance in which, a few days after September 11, 2001, a local circuit court may have engaged in a solicitation for New York firefighters, the only reference in the record to court-approved local fundraising solicitations is to circumstances involving the local analog of the Governor's food drive—that is, situations in which the local court has, as an intramural matter, sponsored or "adopted" a charitable effort in which employees are invited to participate.