Argued and submitted July 1, 1986, Court of Appeals affirmed, circuit court reversed
and remanded to circuit court July 8, reconsideration denied September 9, 1987

BEST et al,
*Petitioners/Cross-Respondents on Review,*

*v.*

UNITED STATES
NATIONAL BANK OF OREGON,
*Respondent/Cross-Petitioner on Review.*

(TC A7905-02523; CA A32299; SC S32749, S32751)

739 P2d 554

Phil Goldsmith, Portland, argued the cause for petitioners/cross-respondents on review. With him on the briefs were Henry A. Carey, P.C., and John D. Ryan, P.C., Portland.

James N. Westwood, Portland, argued the cause for respondent/cross-petitioner on review. With him on the briefs were Clifford N. Carlsen, Jr., R. Alan Wight, and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Susan P. Graber, Portland, filed a brief *amicus curiae* for First Interstate Bank of Oregon, N.A. With her on the brief were William M. McAllister, Christine Kitchel, Edward J. Reeves, and Stoel, Rives, Boley, Fraser & Wyse, Portland.

Before Peterson, Chief Justice, and Lent, Linde, Carson, Jones and Gillette, Justices.

LENT, J.

## LENT, J.

Defendant U.S. National Bank (the Bank) charges its checking account depositors a fee for processing nonsufficient fund (NSF) checks written on their accounts. Between 1973 and 1979, the Bank increased its NSF fee from $3 to $5 per check. Plaintiffs Lonnie and Teresa Best were among the Bank's depositors whose accounts were assessed NSF charges during this period. The Bests, individually and as representatives of a class of depositors, brought this action to recover the charges. They contend that the Bank's NSF fees were unlawful because the fees greatly exceeded the Bank's costs for processing NSF checks.

The Bests alleged six claims for relief, three of which were certified by the circuit court as class actions. Only the claims certified as class actions are at issue here. Those claims are (1) that the Bank breached its obligation to set NSF fees in good faith, (2) that its NSF fees were unconscionable and (3) that its NSF fees were an unlawful penalty for breach of contract. On the penalty and breach of good faith claims, the circuit court certified a plaintiff class comprising all natural persons who had nonbusiness checking accounts with the Bank and who paid NSF charges totaling $6 or more between May 31, 1973, and May 30, 1979. On the unconscionability claim, the court certified a plaintiff subclass comprising class members who opened checking accounts with the Bank on or after July 1, 1968.[1] (Hereinafter, we will refer to all plaintiffs as "the depositors.")

The circuit court granted the Bank's motion for summary judgment on the class claims and entered final judgment dismissing those claims.[2] On appeal by the depositors, the Court of Appeals reversed and remanded with respect to the breach of good faith claim but otherwise affirmed the circuit court. *Best v. U. S. National Bank,* 78 Or App 1, 714 P2d 1049 (1986). We allowed both the depositors' and the Bank's petitions for review and affirm the decision of the Court of Appeals.

---

[1] July 1, 1968, appears to be the date on which the Bank instituted the $3 fee for NSF checks.

[2] The circuit court expressly found that there was no just reason to delay entry of judgment on the class claims. ORCP 67B.

## I.

Before discussing the depositors' breach of good faith claim, we will briefly address their penalty and unconscionability claims.

■ The depositors claim that the Bank's NSF fees were unlawful penalties for breaches of the depositors' express or implied contractual agreements not to write NSF checks. We agree with the Court of Appeals that the depositors did not present any evidence from which a trier of fact could infer the existence of such an agreement. *See* 78 Or App at 4-10. There being no agreement, there could be no unlawful penalty for breach of the agreement.

The depositors claim that the Bank's NSF fees were unconscionable because the fees were greatly in excess of the Bank's costs for processing NSF checks. The doctrine of unconscionability, however, is largely inapplicable to this case, and, to the extent that it may apply, we conclude that the fee set by the Bank was not unconscionable.

■ Unconscionability is a legal issue that must be assessed as of the time of contract formation. *W.L. May Co. v. Philco-Ford Corp.,* 273 Or 701, 707, 543 P2d 283 (1975). Thus, the doctrine applies to contract terms rather than to contract performance. The only contract term relevant to NSF fees was a statement in the preprinted "account agreement" signed by the depositors when they opened their accounts: "This account is subject to Bank service charges existing at any time." The parties agree that "service charges" included NSF fees. The specific fee charged, then, was not part of the depositors' agreement with the Bank; rather, the fee was set by the Bank as part of its performance of the account agreement. The unconscionability doctrine is inapplicable to the amount of the fee.

If the depositors were or should have been aware of the fee amounts and tacitly agreed to the amounts through failing to close their accounts, see Part II, *infra,* they could challenge the agreements as unconscionable. Summary judgment on their unconscionability claim, however, would still be appropriate.

■ Although the depositors assert that the Bank's NSF

fees were two or three times the Bank's NSF processing costs, the fees were relatively small and were similar to NSF fees charged by other banks. Moreover, apart from the adhesive nature of the account agreement, the record reflects few indicia of one-sided bargaining. The depositors could close their accounts at any time and for any reason. There is no evidence that the depositors were not of ordinary intelligence and experience. There is also no evidence that the Bank obtained any agreement from the depositors through deception or any other improper means. The circuit court's grant of summary judgment on the depositors' unconscionability claim was proper.[3]

## II.

The depositors claim that the Bank had an obligation to set its NSF fees in good faith and that it breached this obligation by setting its fees at amounts greatly in excess of the costs incurred by it in processing NSF checks.

■ Nothing in the depositors' account agreement with the Bank expressly limited the Bank's authority to set NSF fees. This court has long stated, however, that there is an obligation of good faith in the performance and enforcement of every contract. *See, e.g., Comini v. Union Oil Co.,* 277 Or 753, 756, 562 P2d 175 (1977); *Perkins v. Standard Oil Co.,* 235 Or 7, 16, 383 P2d 107 (1963); *see also* Restatement (Second) of Contracts § 205 (1979). This obligation limited the Bank's apparently unlimited authority to set NSF fees, and the depositors can recover for the breach of this obligation just as they could for the breach of any other contractual obligation.

■ The Bank and *amicus curiae* First Interstate Bank of Oregon argue that the doctrine of good faith is inapplicable because the depositors agreed to the NSF fees by maintaining their accounts, which they could close at any time.[4] Whether the depositors agreed to the specific fees charged, however, is a

---

[3] Because of our disposition of this issue, we express no opinion on the Court of Appeals' conclusion that the doctrine of unconscionability is not a basis for affirmative relief.

[4] The Bank was also free to close the accounts. If it had not been free to do so, its argument would be much weaker because the depositors would have had a contractual entitlement to the continuation of account service fees that had been set in good faith.

question of fact that cannot be decided on a motion for summary judgment. The argument of the Bank and *amicus* assumes that the depositors knew or should have known the amount of the fees when they wrote their NSF checks. This assumption does not necessarily follow from the evidence. The practice of Bank employees who opened accounts was not to inform depositors of the amount or even of the existence of NSF fees unless the depositor inquired. The Bank also did not notify depositors when it increased its NSF fees. In the absence of inquiry, a depositor would ordinarily know the amount of the fee only if the depositor had been charged a fee, in which case the amount would appear on the depositor's monthly statement of account. Moreover, even if the depositor discovered the current amount of the NSF fee, the depositor could never be certain of the fee that would be charged because the Bank could increase or decrease the fee at any time without notice. It would be improper under this evidence to conclude on a motion for summary judgment that the depositors agreed to the charges through failing to close their accounts.

Assuming that there was no agreement, the question before us is whether there is a genuine issue of material fact whether the Bank set its NSF fees in good faith.

The purpose of the good faith doctrine is to prohibit improper behavior in the performance and enforcement of contracts. Because the doctrine must be applied to the entire range of contracts, definitions of good faith tend to be either too abstract or applicable only to specific contexts. For this reason, Professor Summers has argued that good faith should be conceptualized as an "excluder," by which he means that good faith should be defined only by identifying various forms of bad faith. Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization,* 67 Cornell L Rev 810 (1982); *see also* Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 Va L Rev 195, 199-207 (1968). This is also the approach adopted by the Restatement (Second) of Contracts § 205 (1979):

"The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency

with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."

Restatement (Second) of Contracts § 205, *comment a* (1979).

"Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance."

Restatement (Second) of Contracts § 205, *comment d* (1979).

This does not mean that decisions as to what constitutes bad faith must be *ad hoc* and standardless. Without attempting to give positive content to the phrase "good faith," it is possible to set forth operational standards by which good faith can be distinguished from bad faith within a particular context. Professors Summers and Burton, although in substantial disagreement with each other, have proposed such standards. *See* Summers, *supra,* 67 Cornell L Rev at 823-24; Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv L Rev 369 (1980).

This court also has not attempted to set forth a comprehensive definition of good faith. But in line with the Restatement and traditional principles of contract law, the court has sought through the good faith doctrine to effectuate the reasonable contractual expectations of the parties. *See Comini,* 277 Or at 756-57; *Perkins,* 235 Or at 15-17. When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith. *Id.; see also* Burton, *supra.*

To illustrate, in *Comini* the defendant oil company

had a contractual right to disapprove the plaintiff distributor's transfer of the distributorship. This court concluded that the right was intended by the parties to protect the oil company's legitimate business interests in its distribution system. *Comini,* 277 Or at 756. Thus, the oil company could, consistent with its obligation to perform in good faith, reject a transfer to someone inexperienced in the oil business and even reject a transfer to an experienced distributor when it had decided to consolidate the distributorship with another distributorship. *Id.* at 756-57. But the oil company would have performed in bad faith if, for example, it had rejected a transfer in order to retaliate against the distributor for some reason. Similarly, the parties to an employment contract generally contemplate that an employer may use its discretion to fire an at-will employee if the employer is dissatisfied with the employee's performance or if the employee's services are no longer required. The parties do not ordinarily contemplate, however, that the employer may fire the employee in order to deprive the employee of benefits to which the employee would otherwise have become entitled if the employment had continued. An employer who does the latter breaches its obligation to perform in good faith. *State ex rel Roberts v. Public Finance Co.,* 294 Or 713, 719 n 4, 662 P2d 330 (1983); *cf. Swanson v. Van Duyn Choc. Shops,* 282 Or 491, 494, 579 P2d 239 (1978).

In this case, the Bank had the contractual discretion to set its NSF fees. Under *Comini* and *Perkins* that discretion had to be exercised within the confines of the reasonable expectations of the depositors. It is therefore not necessarily sufficient, as the Bank contends, that the Bank acted honestly in setting its NSF fees or that its fees were similar to those of other banks. Undoubtedly, parties to a contract always expect that the other party will perform the contract honestly and, where the performance of a commercial enterprise is at issue, ordinarily expect that it will do so in a commercially reasonable manner. But the reasonable expectations of the parties need not be so limited.

So far as we can discern from the record, the depositors did not explicitly argue before the circuit court that the Bank's setting of its NSF fees was not in accord with their contractual expectations. Their complaint alleged only that the Bank's NSF fees were greatly in excess of its reasonable

costs. In their argument on the Bank's motion for summary judgment, they treated the good faith and unconscionability doctrines as substantively equivalent, arguing that the Bank's NSF fees were set in bad faith because they were set at amounts that were unconscionable. Before the Court of Appeals, however, the depositors argued that the fees were set in bad faith not only because the fees were unconscionable but because the depositors reasonably expected the Bank to exercise its discretion to set NSF fees for the purpose of permitting it to recover its costs of processing NSF checks. Although this argument was not explicitly made before the circuit court, we will address both arguments on review because the nature of the good faith obligation has been somewhat unclear.

When a party has the contractual right to specify a price term, the term specified may be so high or low that the party will be deemed to have acted in bad faith regardless of the reasonable expectations of the other party. In this respect the good faith and unconscionability doctrines tend to run together. In general, however, whether a specified price violates the obligation of good faith should be decided by the reasonable contractual expectations of the parties. In this instance we conclude that the Bank's NSF fees were not so high as to be evidence of bad faith for that reason alone.

Nevertheless, we believe that there is a genuine issue of material fact whether the Bank set its NSF fees in accordance with the reasonable expectations of the parties. The record shows that when the depositors opened their accounts, the only account fees that would ordinarily be discussed would be the Bank's monthly and per check charges, if any. The sole reference to NSF fees was contained in the account agreement signed by the depositors, which obligated them to pay the Bank's "service charges in effect at any time." Because NSF fees were incidental to the Bank's principal checking account fees and were denominated "service charges," a trier of fact could infer that the depositors reasonably expected that NSF fees would be special fees to cover the costs of extraordinary services. This inference could reasonably lead to the further inference that the depositors reasonably expected that the Bank's NSF fees would be priced similarly to those checking account fees of which the depositors were aware—the Bank's monthly checking account service fees and per check fees, if any. By "priced similarly," we mean priced to cover the

Bank's NSF check processing costs plus an allowance for overhead costs plus the Bank's ordinary profit margin on checking account services.

Finally, assuming that the Bank's obligation of good faith required the Bank to set its NSF fees in accordance with its costs and ordinary profit margin, there was evidence that the Bank breached the obligation. The Bank's own cost studies show that its NSF fees were set at amounts greatly in excess of its costs and ordinary profit margin. Internal memoranda and depositions of Bank employees permit the inference that the Bank's NSF fees were set at these high levels in order to reap the large profits to be made from the apparently inelastic "demand" for the processing of NSF checks and in order to discourage its depositors from carelessly writing NSF checks. A trier of fact could find that both of these purposes were contrary to the reasonable expectations of the depositors when they agreed to pay whatever NSF fee was set by the Bank.

Because there are genuine issues of material fact with respect to the depositors' breach of good faith claim, the trial court erred in granting the Bank summary judgment on this claim.

## III.

The Bank nonetheless argues that the depositors' claims, even if valid, must be rejected because the Oregon law of contracts upon which they rely is preempted by federal law.[5] The Bank bases its argument on its status as a national bank, chartered under federal law. Because we affirm the circuit

---

[5] There is some question whether the defense of federal preemption was properly raised before the circuit court. The Bank first appears to have raised the defense in July 1983, more than four years after the original complaint was filed. In November 1983, the Bank sought to amend its answer to include the defense. The trial court denied leave to amend and entered judgment in favor of the Bank on February 15, 1984. Subsequently, the trial court reconsidered its denial of leave to amend, allowed the amendment, set aside its earlier judgment and entered a new judgment in favor of the Bank on March 12, 1984. The order setting aside the earlier judgment, however, was inadvertently not entered until April 6, 1984, after the depositors and the Bank had filed notices of appeal. The depositors assert that this series of events made the Bank's amendment of its answer ineffective and precludes the Bank from raising the defense of preemption on appeal. In light of our disposition of the preemption issue, we need not decide whether the defense was properly raised. We shall assume, *arguendo,* that it is properly before us.

court's award of summary judgment to the Bank on the depositors' penalty and unconscionability claims, we will address only whether the depositors' breach of good faith claim is preempted.

Whether a federal law preempts state law is an issue of the interpretation of federal law. *See Derenco v. Benj. Franklin Fed. Sav. and Loan,* 281 Or 533, 537-49, 577 P2d 477 (1978). The present system of national banks was created by the National Bank Act of 1864, 13 Stat 99 (codified as amended primarily at 12 USC §§ 21-220). Congress devised the system during the Civil War to provide a national currency secured by a pledge of United States bonds, and national banks are considered instruments of the government for that purpose. *See Davis v. Elmira Sav. Bank,* 161 US 275, 283, 16 S Ct 502, 40 L Ed 700 (1896). In addition, Congress created the Comptroller of the Currency to administer the act. 12 USC § 1. The Comptroller's responsibilities include prescribing rules and regulations to govern the operations of national banks. 12 USC §§ 1, 93a.

The Bank's obligation under Oregon law to set NSF fees in good faith is not in direct conflict with the federal law governing national banks. There is no federal requirement that national banks charge NSF fees, nor is there a federal statute or regulation that expressly permits national banks to set NSF fees in contravention of state law. *Cf. Fidelity Federal Sav. & Loan Assn. v. de la Cuesta,* 458 US 141, 102 S Ct 3014, 73 L Ed 2d 664 (1982) (federal regulation preempted state limitations on the use of "due-on-sale" clauses where regulation expressly permitted federal savings and loans to use the clauses notwithstanding state law). Under section 8 of the National Bank Act (12 USC § 24), however, national banks have "all such incidental powers as shall be necessary to carry on the business of banking," including "receiving deposits." The Bank argues that the depositors' claims would impair the Bank's power to receive deposits by placing limits on its ability to charge fees for services, such as NSF check processing, associated with deposits.

We have no doubt that national banks have the power to set NSF fees, whether that power is ancillary to their power to receive deposits or stems from the general grant of "all such incidental powers as shall be necessary to carry on

the business of banking." Moreover, because national banks are instruments of federal policy, it is clear that state limits on their power to set NSF fees may run afoul of federal policy and thereby be preempted. *See, e.g., Franklin Nat'l Bank v. New York,* 347 US 373, 74 S Ct 550, 98 L Ed 767 (1954) (state law prohibiting the word "savings" in national bank advertising held preempted because prohibition interfered with the power to receive deposits).

Congress did not intend, however, that national banks would be regulated exclusively by the federal government. "[N]ational banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *Anderson National Bank v. Luckett,* 321 US 233, 248, 64 S Ct 599, 88 L Ed 692 (1944) (state abandoned property law not preempted with respect to deposits in national banks); *see also Franklin National Bank,* 347 US at 378 n 7. In particular, the contracts of national banks have always been governed and construed by state laws, at least insofar as those laws have been of general application and have not been in conflict with federal law. *See Davis,* 161 US at 290; *National Bank v. Commonwealth,* 76 US (9 Wall) 353, 362, 19 L Ed 701 (1870). We do not perceive, then, that Congress intended national banks, as a general matter, to be free of state-imposed obligations of good faith in the performance of contracts. The question remains, however, whether the obligation of good faith is preempted with respect to the specification of NSF fees.

In response to inquiries by Congress and national bank officials in the early 1960s, the Comptroller of the Currency took the position that bank account service fees were to be determined by individual banks on the basis of their costs and competitive position. The Comptroller has continued to adhere to this position. *See* 48 Fed Reg 54319 (December 2, 1983); 12 CFR § 7.8000 (1972); 12 CFR § 7.2 (1963). When bank service fees, including NSF fees, sharply increased during the 1970s, the fees came under attack through lawsuits and calls for legislative restrictions. Perhaps in response to these attacks, the Comptroller issued a detailed interpretive rule, which provides, in relevant part:

> "(b) Establishment of deposit account service charges, and the amounts thereof, is a business decision to be made by

each bank according to sound banking judgment and federal standards of safety and soundness. In establishing deposit account service charges, the bank may consider, but is not limited to considering:

"(1) Costs incurred by the bank, plus profit margin, in providing the service;

"(2) The deterrence of misuse by customers of banking services;

"(3) The enhancement of the competitive position of the bank in accord with the bank's marketing strategy;

"(4) Maintenance of the safety and soundness of the institution.

"(c) A national bank may establish any deposit account service charge pursuant to paragraphs (a) and (b) of this section notwithstanding any state laws which prohibit the charge assessed or limit or restrict the amount of that charge. Such state laws are preempted by the comprehensive federal statutory scheme governing the deposit-taking function of national banks."

12 CFR § 7.8000 (1987).[6] The discussion accompanying the issuance of the rule stated:

"[T]he ruling clarifies that in accordance with general principle [sic] of federal preemption of state law, the amounts of deposit account service charges may not be limited, restricted or prohibited by state law. * * * State laws which limit, restrict, or prohibit the amounts of deposit account service charges by national banks impair the ability of national banks to exercise their authority to take deposits under 12 U.S.C. 24 Seventh. Also, deregulation, including the lifting of interest rate ceilings on numerous types of accounts, underscores the need for national banks to have flexibility in the establishment of deposit account service charges so that they may continue to pay depositors market rates of interest. Further, the safety and soundness of banks depends in significant part on their ability to devise price structures appropriate for their needs. Any state law impediments to national bank flexibility have potentially serious implications for their continued safety and soundness. In such circumstances, the authority to regulate has been given by Congress to this Office as part of its

---

[6] Although the rule was issued in 1983, we believe that in all significant respects it reflects the Comptroller's position during the period at issue in this action. *See* 48 Fed Reg 54319 (December 2, 1983).

mission of monitoring the safety and soundness of the national banking system. Attempts by states to regulate in the area are preempted as being in conflict with the statutory scheme under which the national banking system is regulated."

48 Fed Reg 54319 (December 2, 1983).[7]

When the interpretive rule was issued, it was unclear whether the Comptroller intended the rule itself to preempt state law. The Comptroller shortly thereafter amended the rule to clarify that the rule was *not* intended to preempt state law; rather the rule was intended only to express the Comptroller's position that "the comprehensive federal statutory scheme governing the deposit-taking function of national banks * * * preempts state laws that prohibit or limit the amount of a national bank's deposit account service charges." 49 Fed Reg 28238 (July 11, 1984).

■ As an interpretive rule promulgated without notice and comment under 5 USC § 553, 12 CFR § 7.8000 does not have the force and effect of law. *See Chrysler Corp. v. Brown,* 441 US 281, 312-16, 99 S Ct 1705, 60 L Ed 2d 208 (1979). Nonetheless, an interpretive ruling "is entitled to deference unless it can be said not to be a reasoned and supportable interpretation of the act" upon which it is based. *Whirlpool Corp. v. Marshall,* 445 US 1, 11, 100 S Ct 883, 63 L Ed 2d 154 (1980); *cf. Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 US 89, 97-98 & n 8, 104 S Ct 439, 78 L Ed 2d 195 (1983) (courts should uphold reasonable and defensible constructions of an agency's enabling act but should not permit the unauthorized assumption by an agency of major policy decisions properly made by Congress).

---

[7] That a free market in bank service charges was a congressional goal at the time the NSF charges were assessed in this action is far from clear. The banking deregulation accomplished by the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub L 96-211, 94 Stat 132, and the Garn-St. Germain Depository Institutions Act of 1982, Pub L 97-320, 96 Stat 14, upon which both the Bank and the Comptroller rely for their interpretations, were enacted after the relevant period for this action. Congressional policy expressed in those acts, absent any indication that the policy was intended to be retroactive, has no bearing on this case. *See Derenco v. Benj. Franklin Fed. Sav. and Loan,* 281 Or 533, 539 & n 7, 577 P2d 477 (1978); *cf. Ray v. Atlantic Richfield Co.,* 435 US 151, 172, 98 S Ct 988, 55 L Ed 2d 179 (1978) (until proposed rule that would preempt state law is made final, state action is not restricted by that rule). Prior to those acts, there were significant limitations, both state and federal, on the banking market, and significant limitations remain.

We do not believe that the depositors' good faith claim is inconsistent with the Comptroller's interpretation of the National Bank Act. The Comptroller's interpretation would preempt only those "state laws which *prohibit* the charge assessed or limit or restrict the *amount* of that charge." 12 CFR § 7.8000(c) (1987) (emphasis added). The depositors' good faith claim, as it now stands, does none of these things. The Bank's obligation to set its NSF fees in good faith obviously does not prohibit it from charging NSF fees. In addition, the obligation does not of itself impose any particular limit on the amount that the Bank may charge. The obligation requires only that the Bank charge an amount that is within the reasonable expectations of the depositors. So long as the Bank takes steps to ensure that the amount is within those expectations, it could set the fee at any amount it wished. The obligation of good faith, then, does not limit the *amount* of the Bank's NSF fee, but only the contractual procedure by which it is set.

Given the historical application of state contract law to national banks, the Comptroller's interpretation would make little sense if it freed national banks from contractual limits on their ability to charge NSF fees. Contractual limits are essentially limits that national banks impose upon themselves. The state acts only to enforce the agreement of the parties. Of course, certain contract doctrines do more than this and may on that account be preempted. The depositors' penalty and unconscionability claims would impose judicial notions of proper contract terms on the agreement made in this case. This is also true of the depositors' good faith claim insofar as it goes beyond attempting to enforce contractual expectations. But whether these aspects of state contract law are preempted is no longer an issue in this case.

We conclude that neither Congress nor the Comptroller has precluded the depositors' good faith claim as it now stands. What the National Bank Act forbids is state regulation of account service fees. It does not free national banks from state contract law that enforces only the reasonable contractual expectations of the bank and its depositors. This is not to say that the Comptroller could not preempt the application of state contract law to bank service charges if the Comptroller wished to do so. That issue, however, is not before us.

 *Amicus curiae* First Interstate Bank asserts one other federal preemption ground that we shall briefly address. *Amicus* contends that this action interferes with the Comptroller's exclusive visitorial authority over national banks, *see* 12 USC §§ 481, 484, "because national bank records would be subject to inspection to see if NSF charges are 'cost justified.'" *Amicus* does not suggest in what manner such an inspection would interfere with the Comptroller's visitorial authority under 12 USC § 481; no evidence has been presented that such inspections would impair the Comptroller's ability to examine the records of national banks.

Nevertheless, 12 USC § 484(A) provides that "[n]o national bank shall be subject to any visitorial powers except as * * * vested in the courts of justice * * *." Visitorial powers for purposes of section 484 are powers associated with inspections to ensure compliance with banking laws. *See Guthrie v. Harkness,* 199 US 148, 157-59, 26 S Ct 4, 50 L Ed 130 (1905); *State v. First Nat. Bank of Portland,* 61 Or 551, 557-60, 123 P 712 (1912). Such inspections by state banking authorities may interfere with the Comptroller's duty to regulate national banks and may be prohibited by section 484. *E.g., National State Bank, Elizabeth N.J. v. Long,* 630 F2d 981 (3d Cir 1980) (inspections by state banking authorities to ensure compliance with state "redlining" laws preempted). *But see State by Lord v. First Nat. Bank of St. Paul,* 313 NW2d 390 (Minn 1981) (inspections by state banking authorities to ensure compliance with state escheat laws not preempted).

Any inspections or disclosures required by the depositors' action would not be an exercise of visitorial powers because these actions would not be for the purpose of regulation. *Cf. Guthrie v. Harkness, supra,* 199 US at 158-59 (stockholder's common law right to inspect the records of a national bank is not a visitorial power). Moreover, even if these actions could be characterized as an exercise of visitorial powers, section 484's exception for visitorial powers "vested in the courts of justice" would be applicable. *Cf. id.* at 159 (stockholder's common law right to inspect the records of a national bank, even if a visitorial power, is within the exception for visitorial powers vested in the courts of justice).

The decision of the Court of Appeals is affirmed. The circuit court's judgment with respect to the depositors' breach

of good faith claim is reversed, and the case is remanded to the circuit court for further proceedings consistent with this opinion.