LANDYE BENNETT BLUMSTEIN, LLP,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

JEFFREY S. MUTNICK, PC,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

Jeffrey S. MUTNICK,
*Defendant/Cross-Respondent.*

Multnomah County Circuit Court
071011291; A145421

346 P3d 1265

Robert K. Udziela argued the cause and filed the briefs for appellant-cross-respondent Jeffrey S. Mutnick, PC, and cross-respondent Jeffrey S. Mutnick.

Meagan A. Flynn argued the cause for respondent-cross-appellant. With her on the brief were Preston, Bunnell & Flynn, LLP, and Kim T. Buckley and Esler Stephens & Buckley.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

DUNCAN, P. J.

---

* Haselton, C. J., *vice* Wollheim, S. J.

## DUNCAN, P. J.

This is an appeal from a judgment for plaintiff Landye Bennnett Blumstein (LBB), a law partnership, in an action against its former partner, defendant Jeffrey S. Mutnick, PC (Mutnick PC) and Mutnick PC's principal, Jeffrey Mutnick.[1] The dispute arose in the context of Mutnick PC's withdrawal from the firm and the parties' inability to agree on the compensation owed to Mutnick PC upon its withdrawal and a division of attorney fees and costs on Mutnick PC's cases. LBB sought a declaration that, under the parties' partnership agreement, Mutnick PC's cases completed or in progress on the date of Mutnick PC's withdrawal from the firm were firm assets and subject to a lien for attorney fees earned and costs advanced under ORS 87.445.[2] LBB also requested an accounting and foreclosure of its lien. And, LBB alleged that defendants had breached the partnership agreement and their fiduciary duty to the firm, and LBB sought to have them enjoined from further breaches.

Defendants answered LBB's amended complaint with affirmative defenses and counterclaimed for enforcement of partnership rights, wrongful interference with economic relations, and breach of partnership agreement. Defendants' counterclaim for breach of partnership agreement was based on LBB's failure to pay Mutnick PC a bonus from LBB's "bonus pool" after Mutnick PC's withdrawal from the firm. Defendants sought a judicial determination of a purchase price for Mutnick PC's interest in the partnership, and a bonus as part of Mutnick PC's compensation upon its withdrawal from the firm.

The case was tried to the court,[3] which granted LBB's claims against Mutnick PC for declaratory judgment,

---

[1] The defendants are Jeffrey Mutnick individually and Jeffrey S. Mutnick, PC. We refer to Jeffrey S. Mutnick, PC, and Jeffrey Mutnick collectively as "defendants."

[2] ORS 87.445 provides:

"An attorney has a lien upon actions, suits and proceedings after the commencement thereof, and judgments, orders and awards entered therein in the client's favor and the proceeds thereof to the extent of fees and compensation specially agreed upon with the client, or if there is no agreement, for the reasonable value of the services of the attorney."

[3] A reference judge heard the case. ORS 3.305 (setting forth process for requesting referral to a reference judge). Except as otherwise provided in ORS

an accounting, and injunctive relief, but denied its other claims. The court determined that significant portions of fees collected on Mutnick PC cases, for work before Mutnick PC's withdrawal from the firm, belonged to the partnership, and the court allocated those fees accordingly. The court rejected defendants' counterclaims but nonetheless determined that Mutnick PC was entitled to a bonus upon its withdrawal from the firm. Based on the court's allocation of fees on Mutnick PC's cases, offset by the amount the court determined that LBB owed to Mutnick PC as compensation upon its withdrawal from the firm, the court awarded LBB a judgment of $734,298.98. The judgment is stayed pending appeal.

On appeal, Mutnick PC raises three assignments of error,[4] and LBB raises five assignments of error on cross-appeal. We conclude that the trial court erred in two respects in its determination of the compensation owed to Mutnick PC upon its withdrawal from the firm but otherwise affirm.

## I. BACKGROUND

We summarize the background of the case consistently with the trial court's extensive findings, which are supported by evidence in the record. *Sutherlin School Dist. # 130 v. Herrera*, 120 Or App 86, 91, 851 P2d 1171 (1993). Jeffrey Mutnick has practiced law since 1972. While working as a civil trial attorney with the law firm of Pozzi, Wilson & Atchison, he developed a practice in personal injury asbestos litigation. In 1998, Mutnick left the Pozzi firm and entered into a nonequity partnership with LBB. As a nonequity partner, Mutnick had no obligation to contribute capital and had no ownership interest in the firm, but he shared in the firm's profits on a limited basis.

---

3.300 to 3.321, a "reference judge has all the judicial powers and duties of a judge of the circuit court to regulate all proceedings in the trial and disposition of the action on reference." ORS 3.311(4). The reference judge submitted a final written report containing findings of fact and conclusions of law to the clerk of the circuit court. ORS 3.315 (requiring reference judge to submit final written report). The presiding judge "order[ed] the judgment contained in the report entered as the judgment of the court in the action." ORS 3.315(6) (so requiring). For ease of reading, we refer to the reference judge as the trial court.

[4] Only Mutnick PC appeals.

When Mutnick joined LBB as a nonequity partner, he brought with him approximately 200 clients, many of whom had personal injury claims and almost all of whom were being represented by Mutnick on a contingency-fee basis. The nonequity partnership agreement provided that, if Mutnick were to leave the firm after becoming an equity partner, he would retain an interest in any contingent-fee matters he retained after his departure.

In January 2000, Mutnick PC became an equity partner in LBB, and the parties entered into an equity partnership agreement. Pursuant to that agreement—interpretation of which is at issue in this case—Mutnick PC transferred to LBB all of its interest in ongoing cases, including work in process on contingent fee cases and referral fees on cases referred to outside attorneys; in exchange, Mutnick PC received 10 partnership "points" (each point then having a value of $8,550). A "point" is a unit of ownership of LBB.[5] Points are used to determine the amount of capital each equity partner must contribute to the firm per point (point capital)[6] and the division of profits and losses among equity partners per point (point income).[7] The value of a point is determined by dividing the total value of the firm by the total number of points held by the equity partners.

The partnership agreement sets forth the annual distributions to equity partners. Specifically, Section 3 of

[5] As provided in Section 1.01(j) of the partnership agreement, a "point" is an equity unit in the partnership representing a unit of ownership of LBB. Section 3.04 of the partnership agreement describes an equity partner's "partnership points":

"Each Equity Partner holds the number of Points set forth on Schedule 'A.' Any changes in the Points awarded any Equity Partner shall be determined by the Management Committee, subject to the approval of a Majority Vote of Equity Partners, during the period November 1 to February 28 and either set forth on Exhibit A or in the minutes of the Partnership."

[6] Under the partnership agreement, the equity partners determine the amount of capital the firm needs each year, and they divide that amount by the number of points held by all of the partners to determine the firm's capital requirement per point (point capital). Each equity partner is required to maintain a capital account equal to the number of points held by the partner multiplied by the point capital.

[7] Under the partnership agreement, the equity partners share in the firm's profits and losses on a pro rata basis. The profits and losses are divided by the number of points held by all of the equity partners to determine the profits or losses per point (point income).

the partnership agreement provides that equity partners "shall receive an annual guaranteed payment paid in equal semi-monthly installments"; bonuses, as determined by a majority vote of the equity partners, "to adjust guaranteed payments retroactively to compensate extraordinary performance of an Equity Partner relative to such Equity Partner's guaranteed payment"; and a share of profits or losses for the year, based on the partner's ownership interest in the firm.[8]

---

[8] Section 3 of the partnership agreement set forth the annual distributions to partners:

"3.01 Guaranteed Payments. Each Partner shall receive an annual guaranteed payment paid in equal semi-monthly installments. * * *

"3.02 Bonus. A bonus pool is hereby established to adjust guaranteed payments retroactively to compensate extraordinary performance of an Equity Partner relative to such Equity Partner's guaranteed payment. The amount of such bonus pool may be increased or decreased by Majority Vote of Equity Partners following a recommendation of the Management Committee[.] * * * Bonuses to Partners shall be paid as determined by Majority Vote of Equity Partners following a recommendation of the Management Committee after reviewing each Partner's performance during the preceding year.

"3.03 Shares in Profits and Losses. The profits or losses of the Partnership for each Partnership taxable year shall be computed on a cash basis. The Partnership taxable year shall end December 31 of each year. Subject to Section 3.02, profits or losses shall be divided among the Equity Partners by dividing the Point(s) held by each Equity Partner by the sum of the Points held by all Equity Partners; provided, however, that to the extent that the profits of the Partnership exceed $4,000 per Point, or such greater amount, not to exceed 200% of Point Capital as may be determined by the Management Committee, subject to the approval of a Majority Vote of Equity Partners, fifty percent (50%) of such excess profits shall become added to the Equity Partner bonus pool and be allocated in accordance with Section 3.02 hereof.

"3.04 Partnership Points. Each Equity Partner holds the number of Points set forth on Schedule 'A.' Any changes in the Points awarded any Equity Partner shall be determined by the Management Committee, subject to the approval of a Majority Vote of Equity Partners, during the period November 1 to February 28 and either set forth on Exhibit A or in the minutes of the Partnership.

"3.05 Determination of Profits and Losses.

"(a) Profits or losses of the Partnership shall be determined by use of the cash method of accounting in accordance with generally accepted accounting principles. Any gains or losses from the sale of Partnership assets shall be included.

"(b) 'Income' of the Partnership shall include all amounts received by the Partnership or any Partner, Shareholder (other than payments from the Shareholder's corporation) or associate related to the business of the firm, which would constitute taxable income for federal income tax purposes, including, but not limited to, legal fees, director's fees, executor's, administrator's, personal representative's, guardian's, and trustee's fees, honoraria and salaries as an officer or employee of any organization, person or entity."

Another section of the partnership agreement, Section 9.03,[9] sets forth the distributions to an equity partner upon withdrawal from the firm: Section 9.03(a) provides that a voluntarily withdrawn equity partner "shall be entitled to receive" the partner's guaranteed payments, to the effective date of withdrawal and the partner's "point capital," less any partnership losses, to be paid within 30 days of withdrawal. In addition, Section 9.03(b) provides that a partner who voluntarily withdraws and does not engage in the practice of law shall also receive the partner's share of profits and losses, determined at year end, prorated to the effective date of withdrawal and payment for the partner's "ownership points," payable in 36 monthly installments.[10] The partnership agreement does not explicitly provide for the payment of a bonus to a withdrawing partner.

The trial court found that Mutnick PC voluntarily left the firm on July 31, 2007. Thereafter, the court found, LBB paid Mutnick PC its guaranteed payment up to the

---

[9]  As relevant, Section 9.03 provided, in part:

"9.03 <u>Distributions to Voluntarily Withdrawn and Expelled Equity Partners</u>.

"(a) Voluntarily withdrawn and expelled Partners shall be entitled to receive the following:

"(i) Such Equity Partner's guaranteed payment under Section 3.01 to the effective date of withdrawal or expulsion;

"(ii) The amount of such Equity Partner's Point Capital reduced pro rata by any Partnership losses; provided, however, that such losses shall be recalculated at the end of the Partnership year and such Equity Partner's Point Capital restored, if the Partnership has been profitable. Point Capital shall be paid within thirty (30) days of termination. Recalculated Point Capital shall be paid on April 15 of the next year; and

"(b) In addition, voluntarily withdrawn Equity Partners or Equity Partners whose Equity Partner status is terminated solely because their productivity as Equity Partners is deemed unacceptable, and in either case, who do not or whose Shareholder does not engage in the private practice of law *** shall receive additional compensation as follows:

"(i) Such Partner's pro-rata share of profits or losses, if any, determined at the end of the Partnership year in accordance with Section 3.04 and prorated to the effective date of withdrawal or termination; and

"(ii) Payment for such Partner's Points *** provided that to the extent the Partnership acquires the Points, payment shall be in thirty-six (36) equal monthly installments."

[10] The trial court described that provision as a "noncompetition clause," because it penalized a withdrawing partner who continued practicing law by not paying a *pro rata* share of profits or ownership points.

effective date of withdrawal. And, within 30 days of withdrawal, LBB also paid Mutnick PC $112,000 for its point capital. Additionally, LBB paid Mutnick PC $71,670.40, as the value of its share of profits for 2007, prorated to its withdrawal date. Mutnick PC owned 15 ownership points at the time of its withdrawal from the firm (with an estimated value of $14,000 per point), and LBB began making payments for the purchase of those points, for a total purchase price of $210,000. Thus, despite Mutnick PC's continued practice of law, LBB paid to Mutnick PC the amounts described in Section 9.03(b) of the partnership agreement, otherwise subject to the noncompetition clause.

In the first seven months of 2007, Mutnick PC had outperformed the other partners' year-long production. At the end of 2007, LBB's equity partners awarded themselves payments from the bonus pool, but they did not compensate Mutnick PC from the bonus pool.

Until Mutnick PC withdrew from the firm in July 2007, no partner who had withdrawn from LBB had continued in the private practice of law. The partnership agreement did not provide for the transfer of files or the allocation of fees with a partner who continued in private practice, and the parties disputed the method for transferring files and trust funds to Mutnick PC on cases that Mutnick PC or Mutnick had originated. LBB wanted to protect its possessory lien over files for LBB clients that had originated with Mutnick PC or that Mutnick PC desired to take with it. It offered to "loan" the files to Mutnick PC so that Mutnick could continue working on pending cases, but Mutnick refused, insisting that LBB relinquish whatever lien rights it had in the files. After LBB initiated this action in October 2007, Mutnick agreed to protect LBB's lien right, and LBB then began to transfer client files and trust funds to Mutnick PC.

Thereafter, LBB turned over client files and transferred to Mutnick PC the full amount of funds in LBB's client trust accounts relating to the Mutnick PC-originated files, without holding back fees and costs that were owed to LBB. Subsequently, Mutnick PC received recoveries on account of some of the Mutnick PC cases after LBB had

transferred the files, but delivered to LBB only a portion of LBB's costs advanced and none of the attorney fees owed to LBB.

LBB filed the present action. As mentioned, LBB sought a declaration that, under the parties' partnership agreement, Mutnick PC's cases completed or in progress on the date of Mutnick PC's withdrawal from the firm were firm assets and subject to a lien for attorney fees and costs advanced. LBB also sought an accounting and foreclosure of its lien. And, it alleged that defendants had breached the partnership agreement and their fiduciary duty to LBB, and LBB sought to enjoin them from further breaches. In response, defendants filed an answer and counterclaimed for enforcement of partnership rights, wrongful interference with economic relations, and breach of partnership agreement. Defendants requested that the court decide an allocation of fees between LBB and Mutnick PC under the Partnership Act, ORS chapter 67.

The parties' claims and counterclaims were tried in two phases. After the first phase, the court determined the validity and meaning of the partnership agreement in a manner that was largely consistent with LBB's interpretation. The court concluded that, under the terms of the partnership agreement, "[p]artnership records and files, including client files, and all work in process and accounts receivable for cases completed or in progress on Mutnick PC's date of withdrawal, are assets of the firm." The court further concluded that the noncompetition clause (Section 9.03(b)) was unenforceable and severable, and that the agreement was enforceable as modified. The court concluded that LBB had "fully performed all of its obligations to [defendants] that have become due to date under the termination provisions of the Partnership Agreement," and that LBB had not "breached its fiduciary and contractual duties to [defendants]."[11]

---

[11] The court also found in its first letter opinion that LBB "had never paid any part of the Discretionary Fund to an Equity Partner who withdrew," but the court did not explicitly address whether Mutnick PC was entitled to payment from the bonus pool upon withdrawal from the firm.

Following the second phase of trial, the court issued a letter opinion in which it found that the parties had not been well suited as partners and that Mutnick PC's withdrawal from the firm could have been handled more efficiently.[12] However, the court rejected LBB's breach of fiduciary duty claims and defendants' counterclaims for breach of fiduciary duty and interference with economic relations. The court's letter opinion focused on a determination of the amounts the parties owed to each other.

The court first addressed the payments owed by LBB to Mutnick PC upon its withdrawal from the firm. The court reasoned that LBB's income for 2007 included considerable fees ($924,463.38) generated by Mutnick PC's cases, based on work performed before Mutnick PC's withdrawal from the firm.[13] The court attributed $462,213.69 of that amount to the bonus pool for 2007. The court reasoned that, although the partnership agreement did not explicitly provide that a withdrawing partner was entitled to a share of the bonus pool, it did not prohibit such a payment. The court concluded that, in light of the implied duty of good faith and fair dealing, Mutnick PC was entitled to $229,483.99 from the bonus pool for 2007, an amount comparable to the

---

[12] The trial court found:

"The parties were not well suited as partners, and the manner in which they separated their practices after July 31, 2007, could have been performed in a more economical, efficient manner, generating less confusion and chaos. Both parties contributed to the problems, but I find neither party acted in a fashion that would amount to misconduct causing that inefficiency, confusion and chaos. LBB did not do anything wrong and neither party acted with a malevolent or improper motive."

The trial court found that Mutnick's position that LBB should give up its lien was not justified and that Mutnick did not, but should have, agreed to the loan arrangement proposed by LBB pending resolution of the lien issue. The trial court also found that Mutnick should have cooperated with LBB in a business-like way in an inventory of the files. The trial court found that the Mutnick should have agreed to a joint letter to clients explaining Mutnick's departure from the firm and the choices the client had to make regarding representation, and informing the clients of LBB's attorney lien rights, and the fees and costs owned to LBB.

[13] Not all of those fees were actually received by the firm in 2007, but were allocated to the firm based on the court's calculation of the fees LBB was entitled to receive on the Mutnick PC cases. Because the court attributed them to Mutnick PC's work before it left the firm, the court treated the earnings as having been in the bonus pool in 2007 for the purpose of determining whether Mutnick PC was entitled to a payment from the bonus pool.

bonus that had been paid to LBB's highest earning equity partner.[14]

But, the court reasoned, because the value of Mutnick PC's points (and, therefore, the buyout payment) depended in part on the as-yet-uncollected fees on the Mutnick PC cases that the court had allocated to LBB and assigned to the bonus pool or that the court had allocated to

---

[14] As pertinent, the court explained:

"52A.(14) The Partnership Agreement itself, as written, does not explicitly cover the question of whether LBB owes a departing partner any portion of the bonus pool. The Partnership Agreement does not provide that departing partners are not permitted to share in bonus distributions. Historically, is appears that no departing partner has received a portion of the bonus pool, but those persons left under circumstances different from the present case. Under the circumstances of the present case, and in accordance with the implied covenant of good faith and fair dealing, the Partnership Agreement requires LBB to award a portion of the bonus pool to Mutnick PC.

"52B.(15) The objectively reasonable expectations of LBB and Mutnick PC, taking into consideration LBB's past practices, the text of the Partnership Agreement, the financial contribution Mutnick PC made to LBB's 2007 revenue and the fiduciary nature of the relationship between the parties were that Mutnick PC should be entitled to receive the portion of the 2007 Bonus Pool it would have received had it remained a partner until the end of 2007.

"52C.(16) It would be unfair for Mutnick PC, the highest LBB producer, not to receive a share of the firm profit consistent with the compensation paid to other high producing partners. * * *

"* * * * *

"52E.(18) Allocating to 2007 the fees generated on the Mutnick Cases and the Asbestos Cases in accordance with the figures in Exhibit 1, LBB would receive an additional $924,463.38 in fee revenue ('Additional Fee Revenue'). This additional revenue would increase Mutnick PC's '80/20' production by an unknown, but calculable, amount using LBB's historical methods. [An individual attorney's '80/20' production was determined by attributing 80 percent of the resulting fee to the attorney who performed the work and 20 percent to the attorney who had originated the case.]

"* * * * *

"54. Because Mutnick PC was a major producer in 2006 and 2007, it would be wrong to interpret the Partnership Agreement to preclude Mutnick PC from receiving the same percentage of the Discretionary Fund that he would have received had Mutnick finished out the year.

"55. Mutnick PC should receive the same amount from the Discretionary Fund for 2007 as the LBB partner who receive the highest amount calculated on a percentage basis, and the Discretionary Fund for 2007 should be calculated as if LBB received in 2007 the additional amounts of money awarded to LBB in this case. When the percentages are recalculated so that Mutnick PC's percentage equals the highest percentage awarded to an LBB partner from the Discretionary Fund for 2007, the highest percentage is 14.50382%."

Mutnick PC, the payments to Mutnick PC for LBB's buyout of Mutnick PC's points pursuant to Section 9.03(b)(ii) of the partnership agreement would be duplicative. The court concluded, therefore, that the buyout payments should cease and that Mutnick PC should repay to LBB the amount that LBB had already paid ($64,166.63) for the purchase of Mutnick PC's points pursuant to Section 9.03(b)(ii).[15]

As noted, the court found that Mutnick PC's client files were assets of the firm, as were all fees generated before Mutnick PC's withdrawal.[16] But it also found that LBB "had no intent or desire to interfere with Mutnick taking all cases he had originated and worked on." The court then systematically addressed the allocation to the parties of fees and costs on the client files that had originated by Mutnick or Mutnick PC, and that were at various stages of recovery at the time of Mutnick PC's withdrawal from the firm. After estimating the fees allocated to LBB to be $924,463.38, and taking into account Mutnick PC's entitled payments under the partnership agreement, the court concluded that LBB was entitled to a net award in the amount of $734,298.98.

## II.   ANALYSIS

### A.   *Points*

In its first assignment of error, Mutnick PC argues that the court erred in failing to award Mutnick PC the

---

[15] The court explained:

"57. In light of the Court's finding that LBB should pay Mutnick PC 12/12ths of the highest amount awarded to any other partner in 2007 from the Discretionary Fund, the Court further finds that Mutnick PC should not receive $210,000 for its Points because the amounts awarded by the Court to Mutnick PC from the Discretionary Fund include income that is also included in the valuation of Points, and LBB is entitled to a credit against the amount it owes Mutnick PC from the Discretionary Fund in the amount of the payments that LBB has made toward paying off the $210,000."

[16] The court found:

"Under the terms of the firm's Partnership Agreement and Oregon's Partnership Act and by retainer and referral agreements, LBB records and files, including client files (except to the extent the client may have an independent interest in the file), all work in progress, the right to be repaid for costs advanced by LBB, all accounts receivable for cases completed or in progress, and all rights to receive referral fees for cases referred to lawyers outside the firm existing on July 31, 2007, [Mutnick PC's] date of withdrawal from the partnership are partnership assets and partnership business."

value of its points and in requiring Mutnick PC to repay $64,166.63 to LBB. Mutnick PC contends that, without its noncompetition clause (which the court struck from the contract), Section 9.03(b)(ii) of the partnership agreement unambiguously required LBB to pay Mutnick PC the value of its points in 36 monthly installments, as LBB had begun to do. In Mutnick PC's view, the court erred as a matter of law when it determined that Mutnick PC should not receive payment for the buyout of his points. Mutnick PC is correct.

The partnership agreement, as modified by the partnership, governs the payments owed by LBB to Mutnick PC upon its withdrawal from the firm. *See* ORS 67.042 (providing that "relations among the partners and between the partners and the partnership are governed by the partnership agreement"). No party challenges the trial court's determination that the noncompetition clause was unenforceable and could be severed from the agreement and that the agreement is otherwise enforceable. Without the noncompetition clause, Section 9.03(b)(ii) unambiguously required that a withdrawing partner be paid for the partner's points under Section 9.03(a)(ii).[17]

---

[17] Quoted again here for convenience, Section 9.03 of the partnership agreement describes "Distributions to Voluntarily Withdrawn and Expelled Equity Partners":

"(a) Voluntarily withdrawn and expelled Equity Partners shall be entitled to receive the following:

"(i) Such Equity Partner's guaranteed payment under Section 3.01 to the effective date of withdrawal or expulsion;

"(ii) The amount of such Equity Partner's Point Capital reduced pro rata by any Partnership losses; provided, however, that such losses shall be recalculated at the end of the Partnership year and such Equity Partner's Point Capital restored, if the Partnership has been profitable. Point Capital shall be paid within thirty (30) days of termination. Recalculated Point Capital shall be paid on April 15 of the next year; and

"(b) In addition, voluntarily withdrawn Equity Partners * * * shall receive additional compensation as follows:

"(i) Such Partner's pro-rata share of profits or losses, if any, determined at the end of the Partnership year in accordance with Section 3.04 and prorated to the effective date of withdrawal or termination; and

"(ii) Payment for such Partner's Points * * * provided that to the extent the Partnership acquires the Points, payment shall be in thirty-six (36) equal monthly installments."

As explained above, the trial court initially concluded that, under the partnership agreement, LBB was required to pay Mutnick PC for the value of its points but, after awarding Mutnick PC a portion of the bonus pool, the court declined to award Mutnick PC the value of its points, reasoning that a buyout of Mutnick PC's points would duplicate other aspects of the award to Mutnick PC.

We review a court's construction of a contract, such as the partnership agreement, for errors of law. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). When interpreting a contract, we begin by examining the text in the context of the document as a whole. If the provision is clear, the analysis ends there. *Id.* If the provision is ambiguous, we look to extrinsic evidence of the contracting parties' intent. *Id.* at 363. If the provision is still ambiguous, we employ appropriate maxims of construction. *Id.* at 364.

The trial court's initial conclusion regarding the partnership's requirement for the buyout of Mutnick PC's points was correct, based on the clear text of Section 9.03(b)(ii), which provides, in pertinent part, that voluntarily withdrawn equity partners "shall be entitled to receive" "[p]ayment for such Partner's Points." As Mutnick PC correctly notes, that payment is for the purchase of a partner's ownership interest in the firm; it is distinct from other distributions, including guaranteed payments. Furthermore, as Mutnick PC also correctly notes, nothing in the agreement authorizes an alternative payment (such as a bonus, which Mutnick PC contends is income for tax purposes) in lieu of a payment for the partner's points (which Mutnick PC contends is a capital gain for tax purposes). The trial court therefore erred when it failed to award Mutnick PC payment for the purchase of its points. Mutnick PC was entitled to be paid $210,000 for the purchase of its points.

B. *Bonus Pool*

In light of our conclusion that the trial court erred in not awarding Mutnick PC payment for its points pursuant to Section 9.03(b)(ii) of the partnership agreement, we next address LBB's contingent assignment of error on

cross-appeal (asserted only in the event that we modify the judgment), contending that the trial court erred in awarding Mutnick PC a portion of the bonus pool.

As we have previously noted, the partnership agreement governs the relationship among the partners. It explicitly sets forth the payments to which a withdrawing partner is entitled and does not mention payment from the bonus pool. The trial court recognized that, but nonetheless concluded that Mutnick PC was entitled to payment from the bonus pool in light of the obligation of good faith and fair dealing, based on Mutnick PC's high earnings in 2007, the partnership's past practice of awarding bonuses to the highest earning partners at year end, and the bonus that it had in fact awarded to the other partners at year end. LBB contends that the trial court's reasoning was flawed, because the partnership agreement makes no provision for the award of a bonus to a withdrawing partner, and the doctrine of good faith and fair dealing cannot be applied to impose an obligation contrary to the terms of the partnership agreement. *See U. S. National Bank v. Boge*, 311 Or 550, 567, 814 P2d 1082 (1991) ("The obligation of good faith does not vary the substantive terms of the bargain * * *.").

Although the partnership agreement does not *explicitly* require payment from the bonus pool to a withdrawing partner, Mutnick PC argues that payment of a bonus would not be inconsistent with the express terms of the agreement. In fact, it contends that the partnership agreement is plausibly subject to an interpretation that, despite the lack of an explicit provision, a payment from the bonus pool was required. Mutnick PC points out that, although Section 9.03 of the partnership agreement does not explicitly list bonuses among the distributions to a withdrawing partner, it does expressly state that a withdrawing partner is entitled to his or her "guaranteed payment," and that Section 3.02 states that the bonus pool is established "to adjust guaranteed payments retroactively to compensate extraordinary performance of an Equity Partner relative to such Equity Partner's guaranteed payment." Additionally, Mutnick PC points out that Section 3.02 provides that the bonus "shall" be paid. Based on that text, Mutnick PC contends that the

partnership agreement is plausibly subject to the interpretation that a withdrawn partner is entitled to a bonus to compensate for extraordinary performance.

For two reasons, we agree with LBB that the partnership agreement is not plausibly susceptible to the interpretation that a withdrawn partner is entitled to receive a performance bonus. First, Section 3 of the partnership agreement describes the compensation to be paid to equity partners: a guaranteed annual payment, a payment from the bonus pool (at the discretion of the equity partners), and a share of the profits and losses. With regard to bonuses, Section 3.02 provides that "Bonuses shall be paid to partners as determined by Majority Vote of Equity Partners following a recommendation of the Management Committee after reviewing each Partner's performance during the preceding year."[18] A separate section of the partnership agreement, Section 9.03, lists the payments to which a withdrawing partner is entitled. It includes two of the three types of compensation paid to equity partners pursuant to Section 3 (guaranteed payments; shares in profits and losses), but makes no mention of a bonus. The exclusion of a bonus from the list of compensation described in Section 9.03 is a strong indication of an intention not to award a bonus to a withdrawing partner.

Second, bonuses paid under Section 3.02 are to be paid "as determined by Majority Vote of Equity Partners following a recommendation of the Management Committee." The necessary implication is that under the partnership agreement, the payment of a bonus is discretionary with the equity partners. Thus, even if it is construed to *permit* the award of a bonus to a withdrawn partner, there is no basis for concluding that the partnership agreement *requires* that equity partners award such a bonus.

Given the omission of a bonus from the types of compensation paid to withdrawn partners under Section 9

---

[18] The partnership agreement defines a partner as "an individual or a Corporation which is an Equity or Non-equity Partner." The agreement defines an "equity partner" as "any Partner that has been required to contribute capital to the Partnership, that has been assigned Points and that participates fully in the profits and losses of the Partnership."

and the discretionary nature of the bonus, we conclude that the partnership agreement cannot plausibly be construed to *require* payment of a bonus to a withdrawn partner for performance during the preceding year.

The trial court concluded that Mutnick PC was entitled to a bonus in light of the doctrine of good faith and fair dealing. "The purpose of the good faith doctrine is to prohibit improper behavior in the performance and enforcement of contracts." *Best v. U. S. National Bank*, 303 Or 557, 562, 739 P2d 554 (1987). In applying the doctrine, Oregon courts seek "to effectuate the reasonable contractual expectations of the parties." *Id.* at 563. It is the parties' objectively reasonable contractual expectations that are relevant to the parties' duty of good faith and fair dealing. *Best*, 303 Or at 563. The terms of the contract inform what would have been objectively reasonable for the parties to expect in a particular set of circumstances. *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 647-48, 891 P2d 639 (1995). As noted, the obligation of good faith does not vary the substantive terms of the bargain. *Boge*, 311 Or at 567; *Safeco Ins. Co. v. Masood*, 264 Or App 173, 178, 330 P3d 61 (2014) (implied duty of good faith and fair dealing cannot be construed so as to change or insert terms into a contract). Having concluded that the partnership agreement cannot be construed to *require* an award of a bonus to a withdrawn partner, we conclude, further, that the trial court erred in applying the doctrine of good faith and fair dealing to *require* LBB to award Mutnick PC a portion of the bonus pool.

C.  *Other Issues*

In its second assignment of error, Mutnick PC contends that, under the terms of the partnership agreement, Mutnick PC's overall compensation for 2007 was too low, relative to Mutnick PC's "80/20" production. In its third assignment of error, Mutnick PC contends that the trial court erred in its allocation of fees between the parties. In its third assignment of error on cross-appeal, LBB argues that the court erred with respect to its allocation of fees as to one client file. In its fourth and fifth assignments of error on cross-appeal, LBB asserts that the trial court erred in failing to conclude that Mutnick had breached his fiduciary

duty of loyalty to LBB. We have considered and reject each of those contentions without further discussion.

## III. CONCLUSION

With respect to defendants' first assignment of error, we conclude that the trial court erred in failing to award Mutnick PC the value of its points, because the partnership agreement unambiguously requires LBB to pay Mutnick PC the value of those points. With respect to LBB's first and second assignments of error on cross-appeal, we conclude that the court erred in relying on the doctrine of good faith and fair dealing to award Mutnick PC a portion of the bonus pool payment. The remaining assignments of error on appeal and cross-appeal are rejected without further discussion.

On appeal, remanded for modification of judgment to award Jeffrey S. Mutnick, PC, payment for buyout of points pursuant to Section 9.03(b) of the partnership agreement; on cross-appeal, award of $229,483.99 to Jeffrey S. Mutnick, PC, from the bonus pool reversed; otherwise affirmed.